Filed 6/6/13

# IN THE SUPREME COURT OF CALIFORNIA

OSAMAH EL-ATTAR,      )
       )
    Plaintiff and Appellant,    )
       )
    v.        )       S196830
       )
HOLLYWOOD PRESBYTERIAN    )     Ct.App. 2/4 B209056
MEDICAL CENTER,      )
       )     Los Angeles County
    Defendant and Respondent.   )   Super. Ct. No. BS105623
_____)

Hospitals in this state have a dual structure, consisting of an administrative governing body, which oversees the operations of the hospital, and a medical staff, which provides medical services and is generally responsible for ensuring that its members provide adequate medical care to patients at the hospital. In order to practice at a hospital, a physician must be granted staff privileges. Because a hospital's decision to deny a physician staff privileges may have a significant effect on a physician's ability to practice medicine, a physician is entitled to certain procedural protections before such adverse action may be taken. (*Mileikowsky v. West Hills Hospital and Medical Center* (2009) 45 Cal.4th 1259, 1267–1268 (*Mileikowsky*).)

This case arises from the decision of Hollywood Presbyterian Medical Center (Hospital) to deny Dr. Osamah El-Attar's application for reappointment to

Hospital's medical staff. Dr. El-Attar requested a review hearing to challenge the decision. Pursuant to Hospital's bylaws, Hospital's medical staff, acting through its Medical Executive Committee (MEC), had the responsibility to select the hearing officer and panel members of the committee that would hear Dr. El-Attar's claim. The MEC, however, declined to exercise this authority and instead left it to the Hospital's Governing Board to do so. We granted review to determine whether this delegation of authority deprived Dr. El-Attar of the fair hearing to which he was entitled. We conclude that even if such a delegation violated Hospital's bylaws, the violation was not material and, by itself, did not deprive Dr. El-Attar of a fair hearing. Accordingly, we reverse the Court of Appeal's decision concluding that Dr. El-Attar was entitled to relief on this ground alone.

## I.

In July 2002, the federal Centers for Medicare and Medicaid Services advised Hospital that unless it took corrective action to rectify certain deficiencies relating to its oversight of its quality assurance program, it would be removed from the Medicare and Medi-Cal programs. In response, the Governing Board formed an Ad Hoc Committee of the Board (AHC), which engaged two outside auditors. The AHC instructed the auditors to undertake a focused review of Dr. El-Attar's practice at the hospital. Dr. El-Attar had been identified as one of several doctors who might have engaged in a pattern of unnecessary and inappropriate consultations with patients admitted through Hospital's emergency department. He had also been one of the more outspoken critics of Hospital's management and, in particular, its chief executive officer, Albert Greene. Both auditors reviewed randomly selected patient files and identified problems with Dr. El-Attar's patient management and care.

2

Dr. El-Attar's appointment to Hospital's medical staff was due to expire on January 31, 2003. In the fall of 2002 he submitted an application for reappointment. The MEC recommended that the application be approved. On January 28, 2003, however, the Governing Board voted to deny the application and directed Greene to summarily suspend Dr. El-Attar's clinical privileges. The Governing Board's decision to deny Dr. El-Attar's application for reappointment did not require the concurrence of the MEC. But when the MEC refused to ratify the Governing Board's decision to summarily suspend Dr. El-Attar's privileges, the suspension was automatically terminated.

On March 7, 2003, Dr. El-Attar requested a hearing to contest the Governing Board's denial of his application. Hospital's bylaws at that time provided that a judicial review hearing was to be "conducted by a Judicial Review Committee appointed by the Medical Executive Committee and composed of at least five (5) members of the Active Staff" and that the "Medical Executive Committee shall appoint a hearing officer to preside at the hearing."

The MEC met on March 12, 2003. According to the minutes of that meeting, the MEC determined that "since the MEC did not summarily suspend [Dr. El-Attar's] privileges, did not recommend any adverse action relating to [Dr. El-Attar] . . . ; and since the requested hearing would be to review actions by the Governing Board; it should be the Governing Board and not the MEC which arranges and prosecutes the requested hearing." Thus, "a motion was made, seconded and carried that [Dr. El-Attar] should be granted a Judicial Review Hearing; and that the [MEC] leaves the actions relating to the Judicial Review Hearing procedures to the Governing Board."

On March 25, 2003, the AHC, acting on behalf of the Governing Board, issued a notice listing the six charges of misconduct that would be presented at the

3

hearing. The notice also identified the six physicians the AHC had appointed to serve on the Judicial Review Committee (JRC) as well as the individual the AHC had selected to serve as hearing officer.

On April 18, 2003, Dr. El-Attar filed a petition for writ of mandamus and a temporary stay in superior court on the ground that it was unlawful for the Governing Board, rather than the MEC, to have appointed the members of the JRC and the hearing officer. The petition was summarily denied six days later both on the merits and because Dr. El-Attar had not yet exhausted the administrative proceedings.

The judicial review hearing commenced on May 8, 2003 with voir dire of the hearing officer and the JRC members. One member of the panel was excused, and two others subsequently resigned before any evidence was taken. The AHC appointed two replacements, and the evidentiary proceedings began. The proceedings closed on July 18, 2005 after nearly two years and approximately 30 sessions.

On October 25, 2005, the JRC issued its decision. Of the six charges against Dr. El-Attar, the JRC determined that three of them — that Dr. El-Attar had demonstrated a pattern of dangerous, unacceptable, substandard medical practice; that he had engaged in a pattern of inadequate medical record documentation; and that he had engaged in inappropriate and verbally abusive behavior with Hospital staff members — had been established by a preponderance of the evidence. It unanimously concluded that "under all the circumstances of this case, . . . the . . . decision of the Governing Board to deny Dr. El-Attar's application for reappointment . . . was reasonable and warranted, but the Committee notes that if it had been the initial decision maker, it would have pursued an intermediate resolution."

4

Dr. El-Attar appealed the JRC's decision to Hospital's appeal board, challenging it on both procedural and substantive grounds. The appeal board determined that Dr. El-Attar had received a fair hearing and that the JRC's determinations were supported by substantial evidence. Hospital's Governing Board concurred, and in August 2006 it ordered that Dr. El-Attar be terminated from the medical staff.

Dr. El-Attar filed an administrative mandate petition on October 13, 2007. Among other claims, he again asserted that he had been denied a fair proceeding because the Governing Board, rather than the MEC, had chosen the JRC members and hearing officer for his judicial review hearing.

The trial court denied the petition. It concluded that the MEC had delegated its responsibility to designate the participants in the hearing to the Governing Board and that such delegation was not specifically prohibited by Hospital's bylaws and did not violate any rule of fair procedure. It also rejected Dr. El-Attar's other procedural challenges and determined that the decision to terminate him was supported by substantial evidence.

The Court of Appeal reversed. It agreed with the trial court that the MEC had delegated to the Governing Board its authority to select the participants in the judicial review hearing. The Court of Appeal concluded, however, that Hospital's bylaws precluded the MEC from delegating its authority in this fashion. The court explained that "[a]llowing the Governing Board to select the hearing officer and the JRC panel [was] not an inconsequential violation of the Bylaws" because it "undermine[d] the purpose of the peer review mechanism." The Court of Appeal did not find that any of the JRC participants were in fact biased. Instead, it reasoned that "preserving the separateness of [the] dual components" of the peer review process — the hospital's administrative governing body and the medical

5

staff — "promotes the goal of shielding physicians from arbitrary and discriminatory disciplinary action by effectively insulating a governing body bent on removing the physician from the hospital medical staff. Allowing the Governing Board to handpick the JRC members jeopardizes the integrity of the hearing from the beginning and it undercuts the medical staff's right and obligation to perform this self-governing function." Accordingly, the Court of Appeal held, Dr. El-Attar had been deprived of his right to a fair procedure and was entitled to a new judicial review hearing. We granted Hospital's petition for review and now reverse.

## II.

A hospital's duty to provide certain protections to a physician in proceedings to deny staff privileges was grounded originally in the common law doctrine of fair procedure. It has long been established that judicial intervention in a private association's membership decisions is warranted " 'where the considerations of policy and justice [are] sufficiently compelling.' " (*Pinkser v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 550 (*Pinsker II*), quoting *Falcone v. Middlesex County Medical Soc.* (1961) 34 N.J. 582, 590; see also *James v. Marinship Corp.* (1944) 25 Cal.2d 721; *Otto v. Tailors' P. & B. Union* (1888) 75 Cal. 308.) "[W]henever a private association is legally required to refrain from arbitrary action, the association's action must be both substantively rational and procedurally fair." (*Pinkser II*, at p. 550.)

We first applied these common law principles to a medical organization in the two *Pinkser* decisions. In *Pinkser v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 (*Pinkser I*), we held that the plaintiff, a dentist, had a "judicially enforceable right" to have his application for membership to a dental association "considered in a manner comporting with the fundamentals of due

6

process." (*Id.* at p. 166.) In *Pinkser II*, we further elaborated on the procedural protections private associations must furnish in order to satisfy the common law fair procedure requirement. (*Pinkser II*, *supra*, 12 Cal.3d at pp. 550–556.) We held that the requirement "may be satisfied by any one of a variety of procedures which afford a fair opportunity for an applicant to present his position. As such, this court should not attempt to fix a rigid procedure that must invariably be observed. Instead, the associations themselves should retain the initial and primary responsibility for devising a method which provides an applicant adequate notice of the 'charges' against him and a reasonable opportunity to respond. . . . Although the association retains discretion in formalizing such procedures, the courts remain available to afford relief in the event of the abuse of such discretion." (*Id.* at pp. 555–556, fn. omitted.) Because the plaintiff had not been notified of the reason that the dental association rejected his application for membership, and because he was given no opportunity to respond to the charges against him, we held that he was denied his right to a fair procedure. (*Id.* at p. 556.)

We extended these principles to hospital credentialing and peer review decisions in *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802 (*Anton*). In that case, a physician challenged a hospital's decision to summarily suspend his privileges and to deny him reappointment to the hospital staff. (*Id.* at pp. 809–813.) We observed that "a physician may neither be refused admission to, nor expelled from, the staff of a hospital, whether public or private, in the absence of a procedure comporting with the minimum common law requirements of procedural due process." (*Id.* at p. 815, italics omitted.) But we held that the defendant hospital had not violated this common law requirement by applying the wrong version of the hospital's bylaws, by denying the physician any role in

7

choosing the members of the judicial review committee, by refusing the physician's request to be represented by counsel at an initial hearing, or by placing on him the burden of proof. (*Id.* at pp. 826–830.)

*Anton* also clarified that a challenge to such a decision should be treated as a petition for administrative mandate brought pursuant to Code of Civil Procedure section 1094.5. (See *Anton*, *supra*, 19 Cal.3d at pp. 815–817.) Where, as here, a physician challenges the procedures by which a hospital terminated his or her staff privileges, the judicial inquiry "extend[s] to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc. § 1094.5, subd. (b).)

The Legislature subsequently codified the common law fair procedure doctrine in the hospital peer review context by enacting Business and Professions Code sections 809 to 809.8 in 1989. (See *Weinberg v. Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098, 1108 (*Weinberg*); *Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137, 1147; all undesignated statutory references are to the Business and Professions Code.) This legislation — passed in response to the federal Health Care Quality Improvement Act (42 U.S.C. §§ 11101–11152), which provides immunity from money damages for peer review actions taken in compliance with the statute's requirements — established the minimum procedures that hospitals must employ in certain peer review proceedings. (See *Smith v. Selma Community Hospital* (2008) 188 Cal.App.4th 1, 27, fn. 22; Merkel, *Physicians Policing Physicians: The Development of Medical Staff Peer Review Law at California Hospitals* (2004) 38 U.S.F. L.Rev. 301, 318.)

8

As we explained in *Mileikowsky*, the "primary purpose of the peer review process" codified in this legislation is "to protect the health and welfare of the people of California by excluding through the peer review mechanism 'those healing arts practitioners who provide substandard care or who engage in professional misconduct.' (§ 809, subd. (a)(6).)" (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1267.) A second purpose of the legislation, which is "also if not equally important, is to protect competent practitioners from being barred from practice for arbitrary or discriminatory reasons." (*Ibid.*)

Thus, the peer review statute, like the common law fair procedure doctrine that preceded it, "establishes minimum protections for physicians subject to adverse action in the peer review system." (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1268.) The statutory scheme guarantees, among other things, a physician's right to notice and a hearing before a neutral arbitrator or an unbiased panel, the right to call and confront witnesses and to present evidence, and the right to a written decision by a trier of fact. (*Id.* at pp. 1268–1269, citing §§ 809.1, subds. (a), (b), 809.2, subd. (a), 809.3, subds. (a)(3), (4), (b)(1), (2), (3), 809.4, subd. (a)(1).) The statute also permits hospitals to establish procedural protections above and beyond the minimum requirements specifically set out in the code. (See *Mileikowsky*, at p. 1274; § 809.6, subd. (a) ["The parties are bound by any additional notice and hearing provisions contained in any applicable professional society or medical staff bylaws which are not inconsistent with" the specific procedures mandated by the code].)

### III.

We begin our analysis by clarifying the factual circumstances and legal questions before us. As the Court of Appeal concluded, there is substantial evidence in the record to support the trial court's factual finding that the MEC

delegated to the Governing Board its power to select the hearing officer and JRC panel members. The minutes of the MEC's March 12, 2003 meeting state that the MEC "le[ft] the actions relating to the Judicial Review Hearing procedures to the Governing Board." It is debatable, given the apparent friction between the MEC and the Governing Board, whether this language from the minutes indicates a delegation of power or simply reflects the MEC's desire to have nothing to do with the proceedings against Dr. El-Attar. In this appeal, however, we must accept the trial court's finding that the MEC did, in fact, delegate its power of appointment to the Governing Board. We must decide whether this delegation was permissible and, if not, whether Dr. El-Attar is entitled to a new hearing on that ground alone.

No provision of the peer review statute specifically prohibits such a delegation. Section 809.2, subdivision (a) provides that a review hearing shall be held "as determined by the peer review body." Section 809, subdivision (b) defines "peer review body" for the purposes of the statutory scheme to mean "a peer review body as specified in paragraph (1) of subdivision (a) of Section 805," which in turn defines "peer review body" as the "medical or professional staff" of a "health care facility." However, section 809, subdivision (b) also includes within its definition of a peer review body "any designee of the peer review body." Thus, the peer review body that determines how a hearing will be conducted is the medical staff *or* its designee, and the designee may be the hospital's governing board if the medical staff so designates through its bylaws or otherwise. Consistent with these provisions, both the California Medical Association (CMA) model bylaws and the California Hospital Association (CHA) model bylaws contemplate a role for the governing body of a hospital in selecting the judicial review committee members and hearing officer. Under the CMA model bylaws,

10

as the Court of Appeal observed, the governing board may reject the participants recommended to it by the medical staff. Under the CHA model bylaws, of which we take judicial notice, the governing body appoints the participants in the hearing in those cases in which it initiates the adverse action against a physician.

Thus, the Governing Board's exercise of its power as the MEC's designee to select the JRC panel members and hearing officer did not violate any of the specific procedures mandated by the peer review statute. However, Dr. El-Attar contends that these actions violated Hospital's bylaws. Specifically, he claims that the Governing Board's appointment of the JRC panel members and hearing officer violated Hospital Bylaws Article VIII, Section C, subdivision 8, which specified that the Judicial Review Committee will be "appointed by the Medical Executive Committee," and Article VIII, Section C, subdivision 11, which stated that the "Medical Executive Committee shall appoint a hearing officer to preside at the hearing." This deviation from the bylaws, he argues, violated section 809.6, subdivision (a), which makes binding the "additional notice and hearing provisions contained in any applicable professional society or medical staff bylaws," as well as section 809.05, subdivision (a), which prohibits the governing body of a hospital from acting "in an arbitrary or capricious manner."

Although Hospital does not concede the issue, it offers only a brief argument attempting to reconcile the actions of the MEC and the Governing Board with the text of Hospital's bylaws. For the sake of argument, we assume that the Court of Appeal was correct in concluding that the MEC was not authorized by Hospital's bylaws to delegate its authority to select the hearing officer and JRC members for Dr. El-Attar's judicial review hearing. We need not decide that issue because, as we explain, even if the Governing Board's exercise of this authority

11

was contrary to Hospital's bylaws, it does not necessarily mean Dr. El-Attar is entitled to relief.

Not every violation of a hospital's internal procedures provides grounds for judicial intervention. In applying the common law doctrine of fair procedure, we have long recognized that departures from an organization's procedural rules will be disregarded unless they have produced some injustice. (See, e.g., *Levy v. Magnolia Lodge, No. 29, I.O.O.F.* (1895) 110 Cal. 297, 308 [" 'As these are proceedings under articles agreed to by all the members, it is necessary to consider them without much regard to technicalities, and to follow substantial justice more than form.' (*People ex rel. Burton v. St. George's Soc.* (1873) 28 Mich. 261, 262–263.)" ]; *Anton*, *supra*, 19 Cal.3d at p. 826 & fn. 25 [even if the judicial review committee that upheld plaintiff's suspension should have applied a prior version of the defendant hospital's bylaws, plaintiff had failed to demonstrate how this error "resulted in prejudice to him"]; *Dougherty v. Haag* (2008) 165 Cal.App.4th 315, 338–343 [discussing and applying common law fair procedure harmless error doctrine].) As the Court of Appeal observed in *Rhee v. El Camino Hospital District* (1988) 201 Cal.App.3d 477 (*Rhee*), "it cannot be said that a violation of a hospital's bylaws establishes a denial of due process in every case. [Citation.] Rather the question is whether the violation resulted in unfairness, in some way depriving the physician of adequate notice or an opportunity to be heard before impartial judges." (*Id.* at p. 497.)

The Legislature's enactment of the peer review statute in 1989 did not modify the rule that only material deviations from a hospital's bylaws will warrant judgment in favor of a physician challenging the fairness of a judicial review hearing. Section 809.6, subdivision (a), the first of the two provisions invoked by Dr. El-Attar, says hospitals and physicians are "bound by any additional notice

12

and hearing provisions contained in any applicable professional society or medical staff bylaws." Although this provision "authorizes hospitals to develop their own procedures" and makes those procedures binding (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1274), nothing in its text or adoption history suggests that the Legislature sought to displace the requirement of prejudice and instead compel judicial reversal of *every* decision involving a failure to adhere to hospital bylaws.

Likewise, the enactment of section 809.05, subdivision (a), which prohibits the governing body of a hospital from acting "in an arbitrary or capricious manner," did not extend the availability of judicial remedies to those physicians who protest peer review proceedings in which immaterial violations of hospital bylaws have occurred. Instead, the Legislature made clear that relief for purported violations of a physician's right to a fair procedure would continue to be sought by a writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5. (See § 809.8 ["Nothing in Sections 809 to 809.7, inclusive, shall affect the availability of judicial review under Section 1094.5 of the Code of Civil Procedure . . . ."].) That remedy remains available, as before, only where "the respondent has proceeded without, or in excess of, jurisdiction," where the petitioner has been denied "a fair trial," or where "there was any *prejudicial* abuse of discretion." (Code Civ. Proc. § 1094.5, subd. (b), italics added.) Although "abuse of discretion" is established where "the respondent has not proceeded in the manner required by law" (*ibid.*), such a deviation from the mandated procedures is not "prejudicial," and thus does not warrant relief, unless the deviation is material.

## IV.

The Court of Appeal properly recognized these principles, observing that "courts have rejected the notion that any violation of a hospital's bylaws referring

13

to the peer review process is a per se denial of a physician's right to a fair hearing." The question, then, is whether the Court of Appeal was correct to conclude that the violation of Hospital's bylaws it identified was a material deviation that by itself deprived Dr. El-Attar of a fair hearing. That is, if a hospital's bylaws provide that the medical staff is to choose the hearing officer and committee members to serve on a physician's judicial review committee, is the physician necessarily deprived of a fair hearing when the medical staff delegates that power to the hospital's governing body? We hold that such a bylaws violation is not a material deviation that by itself deprived Dr. El-Attar of a fair hearing.

The Court of Appeal said that the Governing Board's selection of the JRC participants was necessarily prejudicial because it "turn[ed] the peer review process on it head" by permitting the hospital's governing body to usurp the role intended to be played by the hospital's medical staff. It is true that the peer review statute, consistent with other statutory provisions requiring that the medical staff be independently organized and self-governing (e.g., §§ 2282, subds. (a), (c), 2282.5), contemplates that a hospital's medical staff will assume the primary role in conducting peer review proceedings. (See §§ 809.05 ["It is the policy of this state that peer review be performed by licentiates."]; 809, subd. (b) [defining "licentiate" as a "a physician and surgeon, podiatrist, clinical psychologist, marriage and family therapist, clinical social worker, professional clinical counselor, or dentist"].) We take judicial notice of the extensive legislative history materials submitted by Hospital, which indicate that the assignment of primary responsibility for peer review to the medical staff was part of the reason that multiple doctors' associations, including the California Medical Association and the Union of American Physicians and Dentists, supported the statute.

14

At the same time, however, the statute does not contemplate a strict separation between the medical staff and the governing body as a prerequisite for a fair peer review system. Section 809.05, subdivision (a) provides: "The governing bodies of acute care hospitals have a legitimate function in the peer review process. In all peer review matters, the governing body shall give great weight to the actions of peer review bodies and, in no event, shall act in an arbitrary or capricious manner." Further, section 809, subdivision (a)(8) provides: "Sections 809 to 809.8, inclusive, shall not affect the respective responsibilities of the organized medical staff or the governing body of an acute care hospital with respect to peer review in the acute care hospital setting." In the context of physician discipline, where a peer review body, contrary to the weight of the evidence, fails to investigate or initiate disciplinary action, the governing body may direct the peer review body to do so after consultation with the peer review body (§ 809.05, subd. (b)), and if the peer review body still fails to do so, then the governing body itself may take action (§ 809.05, subd. (c)).

In other words, the statute provides that although the governing body must give deference to the determinations of the medical staff, it may take unilateral action if warranted. This allowance for independent governing board action furthers the "primary purpose of the peer review process," which "is to protect the health and welfare of the people of California." (*Mileikowsky*, 45 Cal.4th at p. 1267.) If, for whatever reason, the medical staff of a hospital fails to take action against a physician who " 'provide[s] substandard care or who engage[s] in professional misconduct,' " the governing board of the hospital serves as a failsafe to ensure that such a practitioner is removed from the hospital's staff. (*Ibid.*) The Legislature's statutory recognition of the governing board's role reflects the fact that the hospital itself is ultimately responsible for the health and safety of the

15

patients it serves. (See *ibid.*; *Rice v. California Lutheran Hospital* (1945) 27 Cal.2d 296, 299; *Walker v. Sonora Regional Medical Center* (2012) 202 Cal.App.4th 948, 959–960; *Elam v. College Park Hospital* (1982) 132 Cal.App.3d 332, 340.) "A hospital has a duty to ensure the competence of the medical staff by appropriately overseeing the peer review process." (*Hongsathavij v. Queen of Angels/Hollywood Presbyterian Medical Center* (1998) 62 Cal.App.4th 1123, 1143 (*Hongsathavij*); accord, *Weinberg*, *supra*, 119 Cal.App.4th at pp. 1112–1113.)

It is therefore not entirely the case, as the Court of Appeal believed, that a "working peer review system" requires "preserving the separateness of" a hospital's medical staff and its governing body. The statute contemplates the exercise of independent judgment by each entity, and at times the governing body may assume the role normally played by the medical staff in the peer review process without necessarily violating basic norms of fair procedure.

Our decision in *Mileikowsky* does not suggest otherwise. In *Mileikowsky*, a peer review committee and the medical executive committee of the hospital had recommended that Dr. Mileikowsky's application for renewal of his staff privileges be denied. (*Mileikowsky*, 45 Cal.4th at p. 1265.) Dr. Mileikowsky requested a review hearing, which was to be held before a committee comprised of members of the hospital's staff. (*Ibid.*) After Dr. Mileikowsky failed to comply with various discovery orders, the hearing officer ordered terminating sanctions and dismissed the proceedings without the hearing ever having been convened or the matter having been submitted to the reviewing panel. (*Id.* at p. 1266.)

We concluded that the hearing officer's actions were not authorized by the peer review statute and were inconsistent with "the goals of the statutory review process and its allocation of responsibilities for reviewing a peer committee's recommendation. . . . The purpose of providing a physician with a review of the

16

peer review committee's recommendation is to secure for the physician an independent review of that recommendation by a qualified person or entity, here the reviewing panel. That purpose is defeated if the matter is dismissed before the reviewing panel becomes involved." (*Mileikowsky*, 45 Cal.4th at p. 1271). Thus, we held, "the hearing officer lacked authority to prevent the reviewing panel from fulfilling its statutory duty to review the peer review committee's recommendation to deny Dr. Mileikowsky's applications." (*Id.* at p. 1272.)

We then confronted, and rejected, the separate argument that any error committed by the hearing officer had been "cured" because Dr. Mileikowsky had appealed the hearing officer's order to the hospital's governing board, which had affirmed the order. (*Mileikowsky*, 45 Cal.4th at p. 1272.) We observed that "although a hospital's administrative governing body makes the ultimate decision about whether to grant or deny staff privileges, it does so based on the recommendation of its medical staff committee [citation], giving 'great weight to the actions of peer review bodies . . .' (§ 809.05, subd. (a))." (*Ibid.*) The board's action could not "cure" the hearing officer's error because in "simply affirm[ing] the hearing officer's order on its finding that Dr. Mileikowsky's prehearing conduct justified termination of the proceedings," it gave "*no* weight to the actions of *any* peer review body." (*Ibid.*) In other words, the board had not reviewed and considered the determination of the medical committee or the reviewing panel that Dr. Mileikowsky's application for reappointment to the staff should be denied, but rather had considered and agreed with only the hearing officer's conclusion that Dr. Mileikowsky's review hearing should be terminated because of his discovery violations. The board's affirmance therefore did not afford Dr. Miliekowsky anything approaching the procedure to which he was statutorily entitled — that is,

17

a determination by a review panel that the decision to deny his application was justified.  (See *ibid.*)

*Mileikowsky* represents a straightforward application of the basic proposition, consistent with the peer review statute and the common law fair procedure doctrine, that a physician is entitled to a hearing before an independent panel when certain actions are taken against him.  Although *Mileikowsky* acknowledges the distinct roles played by a hospital's governing body and its medical staff, it does not suggest that these two components of the hospital's structure must be kept completely separate or that the governing body has no part to play in the conduct of the internal review proceedings mandated by the peer review statute.  Nor could it, given the statute's explicit recognition of the governing body's "legitimate function in the peer review process."  (§ 809.05, subd. (a).)

Because a hospital's medical staff and its governing body both have significant and at times overlapping roles to play in the peer review process, the identity of the entity that appoints the participants in a physician's judicial review hearing is not, as the Court of Appeal held, necessarily determinative of whether the physician does or does not receive a fair hearing.  This is true even if the governing body takes action that might, under the bylaws, normally be taken by the medical staff.  (See *Weinberg*, *supra*, 119 Cal.App.4th at p. 1112 [governing body has no inherent conflict of interest that prevents it from taking action against physician]; *Hongsthavij*, *supra*, 62 Cal.App.4th at pp. 1142–1143 [same].)  The procedures mandated by the peer review statute or enacted in a hospital's bylaws are designed to provide physicians with certain protections when faced with adverse actions of any sort.  Whether those actions are initiated by the governing body or by the medical staff, a physician is entitled to relief only if the hearing

18

provided was not sufficiently fair to ensure that he or she is not "being barred from practice for arbitrary or discriminatory reasons." (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1267.)

The question here, then, is not simply whether the Governing Board used a power that belonged exclusively to the medical staff under Hospital's bylaws, but whether its use of that power necessarily rendered the proceedings against Dr. El-Attar unfair. That is, assuming the bylaws were violated, did the violation "result[] in unfairness, in some way depriving the physician of adequate notice or an opportunity to be heard before impartial judges"? (*Rhee*, *supra*, 201 Cal.App.3d at p. 497.)

There is certainly the potential for a hospital's governing body to abuse the power of appointment in a way that would deprive a physician of a fair hearing. A hospital's governing body could undoubtedly seek to select hearing officers and panel members biased against the physician. It might even do so because it wishes "to remove a physician from a hospital staff for reasons having no bearing on quality of care." (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1272.) But where, as here, the medical staff has left to the hospital's governing body the task of selecting the participants in the judicial review hearing, we are not persuaded that we must presume *any* hearing officer or panel member appointed by the governing body is likely to be biased. (See *Rhee*, *supra*, 201 Cal.App.3d at p. 494 ["bias cannot be presumed in the absence of facts establishing the probability of unfairness as a practical matter"].)

This is not a situation where " 'experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be . . . tolerable.' [Citation.]" (*Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737.) In the administrative law

19

context, an adjudicator's impartiality in reviewing the propriety of an adverse action taken by an agency may be presumed even if the adjudicator is chosen by, and is a member of, the agency prosecuting the matter. As we observed in *Morongo Band*: "By itself, the combination of investigative, prosecutorial, and adjudicatory functions within a single administrative agency does not create an unacceptable risk of bias . . . ." (*Ibid.*) In that case, we rejected the claim that an Indian tribe's right to due process was violated because the State Water Resources Control Board attorney prosecuting a water license revocation proceeding had also advised the members of the board who adjudicated that proceeding in other unrelated cases. (*Id.* at pp. 737–738.) In so concluding, we followed a line of cases that began with *Withrow v. Larkin* (1975) 421 U.S. 35. *Withrow*, emphasizing the "presumption of honesty and integrity in those serving as adjudicators" (*id.* at p. 47), held that it did not violate due process for the same state medical board that investigated and brought charges against a physician to also adjudicate those charges (*id.* at pp. 47, 57–58).

Similarly here, the fact that the Governing Board initiated the adverse action against Dr. El-Attar does not necessarily mean that those chosen by the Board to adjudicate Dr. El-Attar's appeal would not fulfill that role impartially. Indeed, consistent with decisions such as *Morongo Band* and *Withrow*, the fact that both the CHA and CMA model bylaws provide that a hospital's governing body may participate in the appointment of the review panel in circumstances similar to those here (see *ante*, at pp. 10–11) confirms that the Governing Board's appointment of the review hearing participants did not by itself deprive Dr. El-Attar of a fair hearing. Simply because the governing body of a hospital may be in a position to deprive a physician of a fair hearing does not mean that it is likely to do so.

20

Moreover, we have no basis to presume that review hearing participants chosen by the governing body necessarily have a pecuniary interest in the outcome or some similar conflict of interest that renders them unfit to serve. (Cf. *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1024–1025 [administrative hearing officer with pecuniary interest in outcome of case due to government's manner of selection and payment deemed not impartial]; *Yacub v. Salinas Valley Memorial Healthcare System* (2004) 122 Cal.App.4th 474, 483–486 [physician deprived of fair hearing because hearing officer had a financial conflict of interest]; *Applebaum v. Bd. of Directors of Barton Memorial Hospital* (1980) 104 Cal.App.3d 648, 659–660 [physician deprived of fair procedure when two specialists who had accused him of substandard practice were members of peer review committee].) We see nothing in the mere fact of having been appointed by a hospital's governing body instead of by the medical staff that would inherently cast doubt on the impartiality of a review hearing participant.

The situation would be different if the Governing Board had exercised this power in the face of active resistance by the MEC. If the Board had appointed the hearing participants despite the medical staff's own efforts to do so, the Board would have violated the provisions of the peer review statute providing that it is the peer review body or its designees that determine the manner in which a judicial review hearing is held. (See *ante*, at p. 10; §§ 809, subd. (b), 809.2, subd. (a).) Although we need not decide the issue, such a usurpation of the medical staff's power of appointment may provide grounds to presume that the hearing participants were biased, for in such a case there would be greater reason to think that the Board sought to stack the review panel with participants who would rule in its favor.

21

We add a cautionary note. Although we hold that the assumed violation of Hospital's bylaws in this case was not material, we do not suggest that such bylaws are meaningless or that a violation of a bylaws provision that implements procedural protections above and beyond those specifically mandated by the Legislature could never be found material. Moreover, we emphasize that even when a violation of the bylaws is immaterial, that does not mean it is irrelevant. The violating entity's decision to depart from procedures delineated in the bylaws may constitute evidence of that entity's bad intent, and it may bolster a claim that the entity has taken other action that deprived a physician of his or her right to a fair proceeding.

Importantly, we also do not hold that Dr. El-Attar actually received a fair hearing. Instead, we hold only that the Court of Appeal erred in concluding that the MEC's delegation of the power to select the participants in the hearing and the Governing Body's exercise of this power by itself deprived Dr. El-Attar of a fair hearing. Apart from the claim we reject in this opinion, Dr. El-Attar contends that certain participants in his review hearing were in fact biased and that other procedural violations deprived him of a fair review of Hospital's denial of his application for reappointment. The Court of Appeal's conclusion that the delegation of the power to select the JRC participants was a material violation of Hospital's bylaws made it unnecessary for that court to consider many of Dr. El-Attar's other claims. Instead of deciding those questions here, we leave them to the Court of Appeal to consider in the first instance.

22

## CONCLUSION

We hold that the Court of Appeal erred in concluding that the MEC's delegation of the power to select the participants in the JRC was a material violation of Hospital's bylaws. We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

LIU, J.


WE CONCUR:   CANTIL-SAKAUYE, C. J.
                      KENNARD, J.
                      BAXTER, J.
                      WERDEGAR, J.
                      CHIN, J.
                      CORRIGAN, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** El-Attar v. Hollywood Presbyterian Medical Center
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 198 Cal.App.4th 664
**Rehearing Granted**

_____

**Opinion No.** S196830
**Date Filed:** June 6, 2013
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Mary Ann Murphy

_____

**Counsel:**

Lurie, Zepeda, Schmalz & Hogan, Kurt L. Schmalz and Neeru Jindal for Plaintiff and Appellant.

Law Offices of Astrid G. Meghrigian and Astrid G. Meghrigian for A. S. Moosa, M.D., as Amici Curiae on behalf of Plaintiff and Appellant.

Law Offices of Astrid G. Meghrigian and Astrid G. Meghrigian for Theodore M. Mazer, M.D., and other current or former California Chiefs of Staff as Amici Curiae on behalf of Plaintiff and Appellant.

Fancisco J. Silva, Astrid G. Meghrigian and Long X. Do for California Medical Association and American Medical Association as Amici Curiae on behalf of Plaintiff and Appellant.

Horvitz & Levy, David S. Ettinger, H. Thomas Watson; Christensen & Auer, Jay D. Christensen and Anna M. Suda for Defendant and Respondent.

Arent Fox, Lowell C. Brown and Sarah G. Benator for St. Joseph Health System as Amicus Curiae on behalf of Defendant and Respondent.

DiCaro, Coppo & Popcke, Carlo Coppo, Michael R. Popcke and Shelley A. Carder for BETA Healthcare Group as Amicus Curiae on behalf of Defendant and Respondent.

Nossaman and Ann H. O'Connell for California Hospital Association as Amicus Curiae on behalf of Defendant and Respondent.

Davis Wright Tremaine and Terri D. Keville for Good Samaritan Hospital, L.P., Los Robles Regional Medical Center, San Jose Healthcare System, LP, Riverside Healthcare System, LP, and West Hills Hospital as Amici Curiae on behalf of Defendant and Respondent.

Manatt, Phelps & Phillips, Barry S. Landsberg, Doreen W. Shenfeld and Joanna S. McCallum for Dignity Health and Adventist Health System/West as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kurt L. Schmalz
Lurie, Zepeda, Schmalz & Hogan
9107 Wilshire Boulevard, Suite 800
Beverly Hills, CA  90210-5533
(310) 274-8700

Long X. Do
California Medical Association
1201 J. Street, Suite 200
Sacramento, CA  95814
(916) 444-5532

H. Thomas Watson
Horvitz & Levy
15760 Ventura Boulevard, 18th Floor
Encino, CA  91436-3000
(818) 995-0800

Barry S. Landsberg
Manatt, Phelps & Phillips
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
(310) 312-4000