Filed 10/23/13; pub. order 11/19/13 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| H. MEHRDAD SADEGHI,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SHARP MEMORIAL MEDICAL CENTER CHULA VISTA,<br><br>    Defendant and Respondent. | D060429<br><br><br><br>(Super. Ct. No. 37-2010-00080039-<br> CU-WM-SC) |

APPEAL from an order of the Superior Court of San Diego County, William S. Cannon, Judge.  Affirmed.

H. Mehrdad Sadeghi, in pro. per.; Andrews & Hensleigh, Barbara Hensleigh and Joseph Andrews, for Plaintiff and Appellant.

Procopio, Cory, Hargreaves & Savitch, Richard D. Barton and Jaime D. Quient, for Defendant and Respondent.

Dr. H. Mehrdad Sadeghi's medical staff privileges were summarily suspended by the Medical Staff of Sharp Chula Vista Medical Center (SCV).  Dr. Sadeghi appeals from

the superior court order denying his petition for writ of administrative mandate to compel SCV to void its decision upholding the suspension.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND[1]

This matter arises from a failed surgical procedure by Dr. Sadeghi in 2007.  After the procedure, SCV launched an investigation that raised serious concerns about Dr. Sadeghi's mental health and potential violations of the standard of care.  As a result, Dr. Sadeghi's medical privileges were suspended by the hospital's Medical Executive Committee (MEC), the peer review body responsible for administering physician privileges.  Following this initial suspension, Dr. Sadeghi's privileges were reinstated, but they were again revoked when he failed to comply with conditions imposed by the MEC.  Dr. Sadeghi invoked his right under the hospital's bylaws to a formal judicial review hearing of the MEC's actions.  More than one year into that proceeding, Dr. Sadeghi suspended the hearing to pursue an informal resolution.  When that attempt failed, the hearing resumed and the review panel ultimately upheld the MEC's actions.  Dr. Sadeghi challenged the panel's determination in superior court and this appeal followed.

Dr. Sadeghi is board certified in internal medicine, cardiology and interventional cardiology.  In 2003, SCV granted Dr. Sadeghi privileges in internal medicine,

---

[1]     Dr. Sadeghi filed a motion to lodge or file the administrative record under seal, which was not opposed by SCV.  Due to the patient and peer review information contained in the administrative record, this court treated the motion as one to lodge the appendix as confidential and granted the motion.  We endeavor to discuss the relevant facts in general terms to maintain confidentiality.  However, meaningful discussion of the issues raised by Dr. Sadeghi necessarily requires reference to information contained in the administrative record.

interventional cardiology, and peripheral interventional procedures. His practice focused on interventional cardiology, a subspecialty of cardiology focused on diagnosis and treatment of cardiovascular disease with catheter-based therapy. Dr. Sadeghi's practice also included catheter-based therapy in the kidneys and legs, a field traditionally occupied by interventional radiologists and that was not performed at SCV until Dr. Sadeghi's arrival. In 2005 Dr. Sadeghi was appointed director of SCV's cardiac catheterization laboratory, or "cath lab." The cath lab consists of two suites dedicated to catheter-based interventional procedures staffed by nurses and technicians trained in those therapies.

Around the time he was appointed as director of the cath lab, Dr. Sadeghi and his partner, Dr. Mehran Moussavian, secured a contract that dramatically increased their business. Shortly after, Dr. Moussavian suffered a personal loss, which further increased Dr. Sadeghi's workload. In late 2006, members of the cath lab staff noticed changes in Dr. Sadeghi's behavior and expressed concern about the length of time Dr. Sadeghi was taking to perform procedures.

On February 22, 2007, Dr. Sadeghi began a procedure to attempt to save the leg of an 81-year-old patient who had refused amputation and was in unremitting pain from poor circulation. In addition to circulatory disease, the patient suffered from numerous other life threatening illnesses. The patient and the patient's family were counseled by Dr. Sadeghi and Dr. Moussavian, and internist Dr. Martha Lozano, about the poor chances of the procedure's success, but the patient was steadfastly opposed to losing a leg and becoming a burden to the family. Although initially scheduled to begin earlier, the

3

procedure did not begin until 8:30 p.m. because of an unrelated problem with Dr. Sadeghi's medical record requirements. The procedure was extraordinarily long and marked by numerous complications.

As the surgery progressed past midnight and into the following day, the cath lab staff became increasingly concerned about Dr. Sadeghi's behavior, particularly his unwillingness to end the procedure and the patient's evident discomfort. On the morning of the second day of the procedure, the cath lab supervisor on duty contacted the lab manager, who was on vacation at the time, and also contacted hospital administration, including SCV's CEO Chris Boyd. Throughout the morning, Boyd and other members of the administration came into the lab to address the situation. Dr. Moussavian was also called to assist. The operation lasted 18 hours, not ending until the afternoon of the second day. The patient passed away a few days later.[2]

As a result of the procedure, SCV's chief of staff, Dr. Seung-Yil T. Song, initiated an investigation. Dr. Song requested a review of the case by the hospital's endovascular-medicine chair, Dr. Walter Olsen, and interviews of the involved staff. Interviews of three staff members were conducted on February 27, 2007 by the hospital's cardiology director, Dr. Daniel Cepin, as well as a human resources representative and a member of the hospital's quality council. The three interviewees painted a picture of erratic and irrational behavior by Dr. Sadeghi. They described him criticizing other physicians and

---

[2]    After the patient's death, the family praised Dr. Sadeghi's efforts in following the patient's wishes and refused to participate in any proceeding against Dr. Sadeghi arising from the procedure.

members of the staff and expressing his belief that they were out to get him. A lab technician described another patient, who had been scheduled for a procedure that day, being brought to the cath lab at Dr. Sadeghi's request near midnight, and Dr. Sadeghi asking the technician to film the patient talking about the long hours Dr. Sadeghi was working.

On the evening of February 27, 2007, an informal meeting was arranged with Drs. Sadeghi, Song, Cepin, Lozano, Moussavian and Dr. Errol Korn, the hospital's chair of internal medicine, to discuss the procedure. The other doctors urged Dr. Sadeghi to take time off to rest, but he responded that was not possible. Directly after the meeting with Dr. Sadeghi, the MEC met to discuss the incident. After reports from Dr. Cepin on the three staff interviews and Dr. Korn on the meeting with Dr. Sadeghi, the MEC voted to summarily suspend Dr. Sadeghi's privileges.

Dr. Sadeghi was notified of the suspension the following day by a hand-delivered letter. The letter stated the hospital's medical staff had begun an investigation as a result of the February 22, 2007 procedure. The letter explained the MEC had significant concerns as a result of the investigation and that the summary suspension was necessary to protect the hospital's patients from what it viewed as imminent danger. The letter instructed Dr. Sadeghi to contact the hospital's wellbeing committee immediately for evaluation and notified him of his right under the hospital's bylaws to request an informal hearing with the MEC within seven days.

Dr. Sadeghi invoked this right and appeared before the MEC at its March 6, 2007 meeting. At the meeting, Dr. Sadeghi apologized for his behavior during the February

5

22, 2007 procedure. He admitted he exercised less than optimal judgment with the staff and took full responsibility for the patient's outcome. He also discussed the personal and professional stressors in his life, including Dr. Moussavian's absence from their practice, family pressure, and an unhealthy work environment, he believed were contributing factors to the incident. Dr. Sadeghi also stated he would never again become too close to a family in a way that clouded his medical judgment and said he would resign from the practice of medicine if he were ever involved in a similar incident.

Dr. Sadeghi also reported he met with the wellbeing committee as directed and had complied with that committee's request for a psychiatric evaluation. He stated the psychiatrist told him there was no need for a follow-up appointment. A member of the MEC reported that Dr. Sadeghi had been cleared by the wellbeing committee, but the committee was not available to make a report that day. The MEC voted to terminate the summary suspension. Some members expressed concern that the determination to lift the suspension was premature, but the MEC rejected a motion to table the decision until more information became available, including a report from the wellbeing committee.

On March 9, 2007, the MEC reconvened to follow up on the termination of Dr. Sadeghi's suspension. After discussion, the MEC voted to validate its decision to terminate the summary suspension, but added a condition that Dr. Sadeghi be required to undergo a second evaluation by the psychiatrist with a written report submitted to the wellbeing committee and the MEC. Counsel for SCV, Richard Barton, was present to advise the MEC on Dr. Sadeghi's case. He informed the MEC that an outside review of the February 22, 2007 incident was also being undertaken and experts were being

6

contacted to evaluate the matter.[3] Dr. Sadeghi was advised of the new condition to the termination of his suspension by hand-delivered letter from Dr. Song that day. On April 2, 2007, Dr. Song delivered a second letter reminding Dr. Sadeghi of the requirement he undergo another psychiatric evaluation.

On April 30, 2007, Dr. Sadeghi wrote to Dr. Korn concerning the second psychiatric evaluation. Dr. Sadeghi explained he had seen the psychiatrist a second time before the MEC's March 9, 2007 meeting and, based on his conversations with the members of the wellbeing committee, believed this second visit satisfied the condition on the termination of his suspension. Dr. Sadeghi stated that after he received Dr. Song's April 2, 2007 letter, he spoke with the wellbeing committee which confirmed no further action on his part was necessary. Dr. Sadeghi also outlined a number of concerns he had about the manner in which the investigation was being conducted, including that key witnesses involved in the February 22, 2007 procedure were not interviewed, the failure of a member of the MEC involved in a business dispute with Dr. Sadeghi to recuse himself from the suspension vote, and the qualifications and methodology of the outside reviewers.

Dr. Song and Dr. Korn responded to Dr. Sadeghi by letter dated May 10, 2007, reassuring Dr. Sadeghi the information contained in his letter would be taken into consideration by the MEC. The letter also advised Dr. Sadeghi that despite his statement

---

[3]    Dr. Olsen provided a written report of his review to Dr. Song on May 16, 2007, stating that on February 26, 2007, he informed the MEC an independent outside review was warranted.

7

that he had visited the psychiatrist two times, he was not in compliance with the condition set by the MEC because he had failed to advise the MEC of the specific date on which the visit occurred or provide verifying documentation. The letter explicitly stated that the failure to provide this information would be "considered a violation of [Dr. Sadeghi's] responsibilities under the bylaws" of the hospital. The letter also notified Dr. Sadeghi that hospital employees had complained of harassment by him resulting from his inquiries concerning the hospital's investigation and directed Dr. Sadeghi to cease and desist all contact with hospital employees related to the investigation.

The reports of three outside physicians engaged by the MEC to review the February 22, 2007 procedure were issued on April 23, April 30 and May 11, 2007. All three reports were highly critical of Dr. Sadeghi's conduct. One stated "[t]his was a monumental failure of judgement and procedural conduct" and the "case demonstrates one of the worst violations of patient safety standards I have ever seen in my professional life." The two other reports were equally scathing.

After receipt of the outside reviewers' reports, the MEC scheduled a special meeting for May 17, 2007. Dr. Sadeghi was informed of the meeting and invited to submit additional information in writing to the MEC. He submitted a detailed letter the day of the meeting. In it, Dr. Sadeghi indicated he had an upcoming appointment for a third visit with the psychiatrist to comply with the MEC's directive in the May 10, 2007 letter from Dr. Song and Dr. Korn. He also detailed his performance in the cath lab since the termination of his suspension, including the length of procedures. Dr. Sadeghi explained, with backup documentation, the procedures he had conducted with above

8

average completion times, including one on May 15, 2007, that lasted over seven hours. The MEC was separately informed of the May 15, 2007 case, and as a result Dr. Song asked Dr. Cepin to review the case and provide a report to the MEC.

At the May 17 meeting, the committee members were provided with the reports of the outside reviewers. Dr. Cepin reported on both the May 15 case and additional interviews that had been conducted with members of the cath lab staff involved in the February case. The MEC meeting minutes indicate grave concern over both the findings in the various reports and Dr. Sadeghi's psychological wellbeing, specifically his interaction with employees and his failure to comply with the MEC's directive to follow up with another psychiatric visit. The committee voted, with the member Dr. Sadeghi identified as being in a business dispute with him abstaining, to immediately impose a summary suspension of all of Dr. Sadeghi's privileges. The committee also voted to (1) direct Dr. Sadeghi to attend the Physician Assessment and Clinical Education (PACE) Program at the University of California, San Diego[4] for assessment of his clinical knowledge and judgment, (2) direct him to refrain from any conduct with staff that might be considered threatening, harassing or disruptive, and (3) use the outside reviewers to conduct a second, broader review of Dr. Sadeghi's cases.

Dr. Sadeghi exercised this right and another informal hearing was held on May 29, 2007. By this time, Dr. Sadeghi had retained counsel, David Rosenberg, and Rosenberg

---

4      The PACE Program evaluates physicians referred by hospitals or the California Medical Board. The Program includes evaluation of physician's clinical skills and knowledge, and also offers additional, more specific courses such as record keeping, ethics, prescription dispensing and anger management.

was permitted to attend the hearing as an observer. Dr. Sadeghi and Rosenberg were provided with the reports of the three outside reviewers in advance. At the hearing, Dr. Sadeghi submitted a report from another psychiatrist, Dr. Mark Kalish, who evaluated Dr. Sadeghi at Rosenberg's suggestion. Dr. Kalish's report indicated he found no evidence that Dr. Sadeghi suffered from a diagnosable psychiatric illness. He recommended, however, that Dr. Sadeghi enroll in the PACE Program and participate in three to six months of psychotherapy to assist him in dealing with interpersonal issues and anger management.

With respect to his failure to comply with the MEC's requirement he be seen again by the first psychiatrist, Dr. Sadeghi again explained he met with the psychiatrist twice and had been told by the wellbeing committee that no further evaluation was necessary. Dr. Sadeghi also expressed disagreement with the outside reviewers and asked for the opportunity to provide the MEC with literature supporting his medical conduct during the February 22, 2007 procedure and to address factual errors he perceived in the reports. Finally, Dr. Sadeghi stated he did not pose any risk of imminent harm to patients and indicated his willingness to agree to psychotherapy and to attend the PACE Program.

After Dr. Sadeghi and his counsel were excused from the hearing, the MEC voted to continue its summary suspension of Dr. Sadeghi's interventional cardiology and peripheral interventional privileges. It voted to terminate the suspension of Dr. Sadeghi's general medicine privileges if he satisfied four conditions: (1) submit to a proctoring program, (2) attend the PACE Program, (3) undergo psychotherapy for three to six months, and (4) abstain from conduct that might be considered harassment of the hospital

10

staff.  The MEC also agreed to use two of the outside reviewers to conduct a broader review of Dr. Sadeghi's practice.  Dr. Sadeghi was informed of the MEC's decision by letter dated May 31, 2007, which also advised Dr. Sadeghi of his right to demand a formal judicial review hearing under the hospital's bylaws.  Dr. Sadeghi invoked that right the same day.

Shortly thereafter, Dr. Sadeghi also sought an injunction from the superior court requiring the hospital to reinstate his interventional cardiology privileges.  In addition to seeking an injunction, Dr. Sadeghi's complaint included claims for intentional interference with contractual relations and prospective economic advantage, and a claim for "retaliation for reporting illegal conduct" alleging the suspension of his privileges was reprisal for his reporting of medical billing fraud.  (Capitalization omitted.)  Dr. Sadeghi's request for injunctive relief was denied for failure to exhaust administrative remedies on July 8, 2007.[5]

On June 29, 2007 Dr. Sadeghi was advised by letter that the judicial review hearing would commence on July 9, 2007.  The letter set forth the hospital's notice of

---

[5]     Dr. Sadeghi moves to augment the appellate record to include:  (1) an April 2, 2008 letter from the hearing officer for the judicial review hearing to Barton and Dr. Sadeghi addressing briefing filed by Dr. Sadeghi; (2) an April 18, 2008 letter brief from Barton to the hearing officer responding to the same briefing by Dr. Sadeghi; (3) the transcript from the January 25, 2010 judicial review hearing session; (4) pleadings related to Dr. Sadeghi's attempt to obtain an injunction; and (5) a series of documents concerning a second proceeding related to the MEC's later denial of reinstatement of Dr. Sadeghi's privileges that occurred after the proceeding at issue here was concluded.  SCV does not oppose the motion as to (1)-(4) and we grant the motion as to those documents.  As to the documents related to the later proceeding, the motion is denied.  (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [appellate court cannot augment record with information concerning matters not before the superior court].)

11

charges detailing the reasons for the MEC's actions on May 17 and May 29, 2007. It also identified five proposed members of the Judicial Review Committee (JRC): Dr. David Ostrander, an interventional cardiologist like Dr. Sadeghi; Dr. Michael Plopper, a psychiatrist; Dr. David Hansen, an internist on the hospital's staff; Dr. Mark Huang, a cardiothoracic surgeon also on the hospital's staff; and Dr. Mohsin Saeed, an interventional radiologist. A hearing officer for the proceeding, Carlo Coppo, was chosen jointly by Rosenberg and Barton.

The hearing was convened on July 9, 2007, and counsel conducted voir dire of the JRC members. Prior to the start, Dr. Hansen was replaced by Dr. Marilyn Norton, an oncologist on the hospital's staff. At the conclusion of the voir dire, Dr. Sadeghi objected to Dr. Ostrander based on his prior relationship with Barton. Dr. Ostrander had served as an expert consultant for Barton six years earlier and worked with Barton when Dr. Ostrander served as the hospital's chief of staff. Coppo overruled the objection.

As the judicial review hearing proceeded, the MEC received the reports of the two outside reviewers asked to perform broader, retrospective reviews of Dr. Sadeghi's work. Both reviewers were again highly critical of Dr. Sadeghi's work and raised questions about his competence. After receiving these reports, the MEC amended its notice of charges. Dr. Song notified Dr. Sadeghi of the amendment by letter dated August 24, 2007, which added detailed charges based on the problems identified in the expanded reviews.

The letter also added Dr. Sadeghi's failure to comply with the conditions imposed by the MEC in May, despite repeated assurances from Rosenberg of Dr. Sadeghi's

12

compliance, as an additional basis for the suspension. On September 4, 2007, the MEC reinstated the summary suspension of Dr. Sadeghi's general medicine privileges as a result of his failure to show compliance with the conditions set by the MEC on May 29, 2007. Dr. Sadeghi was notified by a letter the following day, and again advised of his right to an informal hearing.

Dr. Sadeghi requested the informal hearing and appeared with Rosenberg before the MEC on September 20, 2007. Rosenberg explicitly agreed to provide the MEC with confirmation of Dr. Sadeghi's enrollment in the PACE Program and expected completion date, as well as a report from Dr. Sadeghi's private therapist. An undated letter from Dr. Song to Dr. Sadeghi, but purportedly sent after the hearing, again amended the notice of charges. The letter states the information promised by Rosenberg concerning Dr. Sadeghi's compliance with the MEC's conditions was not received. It also added a new charge of failure to comply with the MEC's directive to refrain from harassing behavior based on allegations of Dr. Sadeghi going into the cath lab to obtain information concerning the JRC hearing.

At the start of the next judicial review hearing session on September 25, 2007, Rosenberg challenged the makeup of the JRC, arguing the bylaws required at least three hospital staff members. Rosenberg also objected to the lack of an interventional cardiologist with experience in peripheral procedures on the panel. In response, Barton argued there were only two members of the hospital's staff because of the difficulty in finding doctors without a competing financial interest who also had experience in Dr. Sadeghi's medical specialty, as well as the medical staff's desire to have a panel member

13

with psychiatric expertise who was not previously involved in the matter. With respect to the need for an interventional cardiologist with specific experience in peripheral procedures, Barton responded that it is a rare and emerging subspecialty and the two subspecialties with crossover into the types of procedures conducted by Dr. Sadeghi, interventional cardiologists and interventional radiologists, were represented by Drs. Ostrander and Saeed.

The hearing officer overruled both objections and after opening statements, the evidentiary portion of the hearing commenced. Six additional evidentiary sessions took place over the next several months. On February 28, 2008, Dr. Sadeghi wrote to Coppo indicating he would no longer be represented by Rosenberg and, citing Article VIII, Section 4.B of the hospital's bylaws, requesting the MEC discontinue its own representation.

Coppo convened a conference call the following day with Dr. Sadeghi and Barton to discuss Dr. Sadeghi's request. During the call, Dr. Sadeghi stipulated to Barton's continued representation despite the fact that he would be representing himself, at least for the present. A letter from Coppo memorializing the call included a ruling the hearing would continue as scheduled and Barton was permitted to continue his representation of the MEC. Dr. Sadeghi represented himself at the next hearing session, but Rosenberg resumed his representation thereafter. Five additional hearing sessions occurred in April, May and June, 2008.

Then, on August 4, 2008, while the hearing was still ongoing, Dr. Sadeghi wrote to the hospital's new chief of staff, Dr. Jose A. Lira, and the members of the MEC

14

requesting reinstatement of his privileges. Dr. Sadeghi stated he had been informed by the Medical Board of California (Medical Board) that its investigation was over. Dr. Sadeghi also stated that although he had been informed by MEC members and Barton "that there were no issues with [his] competency and clinical expertise," he enrolled in the PACE Program and anticipated completion in four to six weeks. On August 11, 2008, Dr. Lira responded by letter that the MEC voted to take his request into consideration upon proof of his compliance with its earlier conditions, but that the judicial review hearing should continue as scheduled.

On August 8, 2008, Dr. Sadeghi sent an e-mail to Coppo advising he had retained additional counsel, Erin Muellenberg, and had asked Rosenberg not to work on the case pending the outcome of settlement negotiations with the MEC. The next month, the parties agreed to notify the JRC members they were working " 'on issues relevant to th[e] proceeding' " and further hearing dates were not expected until late October. Settlement negotiations proved unsuccessful and by March 2009, the MEC had voted not to reinstate Dr. Sadeghi's privileges and to resume the judicial review hearing.

After some back and forth between the parties, in August 2009 they agreed to continue the judicial review hearing and Coppo began efforts to reconvene the JRC by contacting the panel members for their availability. In his communications with the panel members, Coppo stated that the JRC was "in a state of adjournment since [its] last session on June 4, 2008 [and] that the best efforts of the parties had not resulted in a resolution of the matter. . . ." In response to Coppo's communication, Dr. Ostrander indicated he would not be available until the end of October 2009 and Dr. Norton was unwilling to

commit to continued involvement. Coppo suggested proceeding with a reduced panel of three. By September 2009, Dr. Sadeghi and the MEC agreed to this proposal and a hearing session was set for that month.

Before hearings resumed, Muellenberg, who had taken over representing Dr. Sadeghi in the matter, raised the issue whether the MEC's March 2009 denial of Dr. Sadeghi's request to be reinstated should be considered by the JRC. On July 21, 2009, Muellenberg wrote to Barton requesting that, in addition to the determination of whether the 2007 suspension of Dr. Sadeghi's privileges was warranted and reasonable, the JRC also decide "Dr. Sadeghi's continued medical staff membership at Sharp." The MEC opposed this approach and sought to limit the JRC to its initial charge of adjudicating whether the MEC's actions in 2007 were appropriate.

The JRC reconvened on September 23, 2009, with a second round of voir dire of the three remaining panel members. Evidentiary hearing sessions resumed in November without a final resolution of the scope of what the JRC would determine. On November 20, 2009, Muellenberg submitted a formal motion to Coppo requesting the JRC's determination of whether the summary suspension imposed by the MEC was reasonable and warranted also include the MEC's March 2009 denial of Dr. Sadeghi's request for reinstatement. Coppo concluded the denial of reinstatement was "not relevant and, therefore, not admissible as evidence of whether or not the corrective actions taken against Dr. Sadeghi on February 26, May 17 and September [4], 2007 were reasonable and warranted." Coppo's letter ruling outlined his concern that "to include the denial of reappointment in the current proceedings would involve the addition of an unknown

16

number of additional exhibits and the testimony of an unknown number of additional witnesses relating to" events that occurred subsequent to the MEC's actions in 2007.

Additional evidentiary hearing sessions continued throughout April with closing arguments on April 21, 2010. On May 26, 2010, the JRC issued its final decision. It concluded the MEC established by a preponderance of evidence that its summary suspension of Dr. Sadeghi's privileges on May 17, 2007, and the modification of that action on May 29, 2007, were reasonable and warranted. The JRC's statement of decision outlines the facts upon which its decision was based with specific detail about Dr. Sadeghi's violation of the standard of care during the February 2007 event and Dr. Sadeghi's failure to rebut that evidence. The JRC also concluded the September 4, 2007 reinstatement of the summary suspension of Dr. Sadeghi's general medicine privileges was reasonable and warranted in light of Dr. Sadeghi's failure to comply with the conditions imposed by the MEC for termination of the suspension.[6]

Pursuant to the hospital's bylaws, Dr. Sadeghi appealed the findings of the JRC to the hospital's board of directors, which appointed an appeal board to hear the matter. The appeal board received briefing from both parties and heard oral argument. It issued a written decision on July 22, 2010, affirming the JRC. Dr. Sadeghi filed a petition for writ

---

[6] The JRC did, however, note its concern regarding the tone of interactions between the MEC and Dr. Sadeghi. The decision specifically pointed to the lack of communication among the members of the MEC and wellbeing committee to confirm Dr. Sadeghi's compliance with its directive that Dr. Sadeghi see its psychiatrist twice, which it believed should have been a relatively easy matter to confirm without Dr. Sadeghi's involvement. The JRC noted this failure in communication potentially led Dr. Sadeghi to take a legal adversarial approach to the proceedings that he otherwise might not have taken.

17

of mandate under Code of Civil Procedure section 1094.5 seeking to void the JRC's decision. The trial court denied the petition and this appeal followed.

DISCUSSION

Our review of JRC's decision, like that of the superior court, is governed by Code of Civil Procedure section 1094.5. Under subdivision (b) of this provision, we determine "whether there was a fair trial," and "whether there was any prejudicial abuse of discretion." (Code Civ. Proc., §1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid*.) Abuse of discretion established by the respondent's failure to proceed in the manner required by law is prejudicial and warrants relief only where "the deviation is material." (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 991.)

I.

"Decisions concerning medical staff membership and privileges are made through a process of hospital peer review. Every licensed hospital is required to have an organized medical staff responsible for the adequacy and quality of the medical care rendered to patients in the hospital. [Citations.] The medical staff must adopt written bylaws 'which provide formal procedures for the evaluation of staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate.' [Citations.] The medical staff acts chiefly through peer review committees, which, among other things, investigate complaints about physicians and

18

recommend whether staff privileges should be granted or renewed." (*Mileikowsky v.*

*West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1267 (*Mileikowsky*).) The

peer review process is codified at Business and Professions Code section 809 et seq.[7] and

is a part of the "comprehensive statutory scheme for the licensure of California

physicians" required to be included in the medical staff bylaws of acute care facilities.

(*Mileikowsky, supra*, 45 Cal.4th at p. 1267.)

"The primary purpose of the peer review process is to protect the health and

welfare of the people of California by excluding through the peer review mechanism

'those healing arts practitioners who provide substandard care or who engage in

professional misconduct.' [Citation.]" (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1267.)

"Another purpose, also if not equally important, is to protect competent practitioners

from being barred from practice for arbitrary or discriminatory reasons. Thus, section

809 recites: 'Peer review, fairly conducted, is essential to preserving the highest

standards of medical practice' ([§ 809], subd. (a)(3)), but '[p]eer review that is not

conducted fairly results in harm both to patients and healing arts practitioners by limiting

access to care' ([§ 809], subd. (a)(4)). Peer review that is not conducted fairly and results

in the unwarranted loss of a qualified physician's right or privilege to use a hospital's

facilities deprives the physician of a property interest directly connected to the

physician's livelihood. [Citation.]" (*Ibid.*) However, "[n]ot every violation of a

---

7      All further statutory references are to the Business and Professions Code unless
otherwise noted.

hospital's internal procedures provides grounds for judicial intervention." (*El-Attar v. Hollywood Presbyterian Medical Center, supra*, 56 Cal.4th at p. 990.)

Because hospitals are under stringent reporting requirements, the denial of staff privileges can be severely detrimental to a physician's career. Section 805 requires hospitals to report the denial or revocation of privileges to the Medical Board, which maintains a historical record that includes this information. Further, hospitals are "usually required to report disciplinary actions to the National Practitioner Data Bank, established for the purpose of tracking the activities of incompetent physicians." (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1268.) Denial or revocation of "privileges therefore may have the effect of ending the physician's career." (*Ibid*.)

With respect to private hospitals, like Sharp Chula Vista Medical Center, the physician's fair procedure rights "arise from section 809 et seq. and not from the due process clauses of the state and federal Constitutions." (*Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 102.) These statutes "establish[] minimum protections for physicians subject to adverse action in the peer review system." (*Mileikowsky, supra*, 45 Cal.4th at p. 1268.) The statutory scheme requires hospitals to provide an affected physician both notice and the opportunity for a hearing when a peer review committee has recommended a "final proposed action" that must be reported to the Medical Board. (§§ 809.1, subds. (a), (b), 809.3, subd. (b)(1), (2) & (3).)

The hearing must be held "before a trier of fact" that, as determined by the peer review body, is either "an arbitrator or arbitrators selected by a process mutually acceptable to the licentiate and the peer review body" or "a panel of unbiased individuals

20

. . . which shall include, where feasible, an individual practicing the same specialty as the licentiate."  (§ 809.2, subd. (a).)  During the hearing, both parties have the right "[t]o call, examine, and cross-examine witnesses" and "[t]o present and rebut evidence determined by the arbitrator or presiding officer to be relevant."  (§ 809.3, subd. (a)(3), (4).)  "Upon the completion of a hearing . . . the licentiate and the peer review body involved have the right to . . . [a] written decision of the trier of fact, including findings of fact and a conclusion articulating the connection between the evidence produced at the hearing and the decision reached."  (§ 809.4, subd. (a)(1).)

## II.

As he did in the trial court, Dr. Sadeghi argues he was denied fair procedure by the MEC, SCV's peer review body, in a number of ways.  He contends (1) the JRC applied an improper standard by not addressing the actions of the MEC that occurred after 2007; (2) the JRC was improperly constituted; (3) Dr. Sadeghi was improperly precluded from communicating with potential witnesses; (4) his lack of representation for one of the hearing sessions was a violation of his rights; and (5) the length of time it took to reach a hearing and the extended length of the hearing constituted a denial of due process.  We

reject these contentions.[8]

A.

Dr. Sadeghi argues the peer review statutes, specifically section 809.3, subdivision (b)(3), required the JRC to determine whether the MEC's actions in 2007 continued to be reasonable and warranted at the time of its decision in May 2010. Section 809.3 sets forth rights of the parties during a physician-requested hearing after a final decision by the hospital's peer review body. Subdivision (b)(3) states: "the peer review body shall bear the burden of persuading the trier of fact by a preponderance of the evidence that the action or recommendation is reasonable and warranted." (§ 809.3, subd. (b)(3).) Consistent with this provision, SCV's bylaws provide "the Medical Executive Committee shall bear the burden of persuading the Judicial Review Committee, by a preponderance of the evidence, that its action or recommendation was reasonable and warranted."

As Dr. Sadeghi points out, the bylaws use the phrase "*was* reasonable and warranted," while the statute uses the phrase "*is* reasonable and warranted." (Second italics added.) Dr. Sadeghi contends the Legislature's use of the word "is" evidenced its intent "that the peer review body bears the burden of establishing that the action or

---

8    We also reject Dr. Sadeghi's comparison of this case to *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434. None of the procedural problems at issue in *Rosenblit* that resulted in the court finding denial of fair process—lack of adequate notice of the charges against the physician, failure to provide the physician with documentation concerning his alleged malfeasance, a conclusory verdict and voir dire of hearing panel members by only the hearing officer outside the presence of the physician—were present here. To the contrary, as discussed herein, Dr. Sadeghi was afforded fair process before and during the hearing as required by the hospital's bylaws and section 809 et seq.

22

recommendation 'is reasonable and warranted' *at the time of the hearing* (i.e., the present) and *not* at the time the decision of the peer review body [was made] (i.e., the past)." We disagree.

The statutory scheme provides a mechanism for the licentiate to challenge a particular action of the peer review body. Section 809.1, subdivision (a) provides a physician with the right to written notice that includes "the right to request a hearing on the final proposed action." That provision defines "final proposed action" as "the final decision or recommendation of the peer review body after informal investigatory activity or prehearing meetings, if any." (§ 809.1, subd. (a).) The hearing required by section 809 et seq. is a safeguard to ensure the prior actions of a peer review body are justified. (See *Mileikowsky, supra*, 45 Cal.4th at pp. 1268-1269 ["A physician . . . has the right to have a second body of peers independently determine whether a peer review committee's recommendation . . . [was] reasonable and warranted . . . ."].) Nothing in these provisions contemplates an open-ended proceeding where the JRC subsumes the role of the MEC to determine, in the first instance, whether a physician who has been previously sanctioned is later fit for reinstatement.

In this case, Dr. Sadeghi was provided with notice of the final proposed action of the MEC (reinstatement of the summary suspension of Dr. Sadeghi's cardiology and interventional privileges) on May 31, 2007. He exercised his right to request a hearing that day. Based on the subsequent actions of Dr. Sadeghi with respect to the conditions imposed by the MEC for termination of that suspension and additional information provided to the MEC by the outside reviewers, the MEC issued subsequent notices

23

amending the initial charges on August 24, 2007 and September 5, 2007. At the time of the amendments, the JRC was at its initial stages. Coppo allowed the inclusion of these new final proposed actions, including suspension of all of Dr. Sadeghi's privileges.[9] Under the bylaws and the peer review statutes, the JRC's role was to determine if the MEC's actions outlined in these notices was reasonable and warranted, not anything further. There was no mandate for the JRC to combine any later actions by the MEC into the ongoing proceeding. Any such action could be challenged in the same manner as the MEC's 2007 actions.[10]

Dr. Sadeghi also contends Coppo improperly precluded evidence about his conduct after September 2007. We disagree. Under both the relevant statutes and the hospital's bylaws, the hearing officer had authority to make rulings concerning the relevance of the evidence. Section 809.3, subdivision (a)(4) provides that during the hearing both parties have the right to "present and rebut evidence determined by the . . . presiding officer to be relevant." Likewise, the bylaws provide: "The hearing officer

[9]    At the time the charges were amended, Dr. Sadeghi took the opposite position of that advanced here, arguing the hearing should proceed only with respect to the initial notice of charges. Coppo allowed the amended charges to be included in the proceeding conditioned on the first evidentiary hearing being postponed no more than 30 days.

[10]    In fact, Dr. Sadeghi's motion to take additional evidence in this court, which we deny, and his motion to augment indicate he has challenged the MEC's subsequent denial of reinstatement of his privileges and a second judicial review hearing is underway. We note Dr. Sadeghi's allegation in his motion to take additional evidence that the MEC continued his privileges for six months at a time while the suspension was in place and the JRC proceeded. The SCV's bylaws, however, state clearly that "the terms of the summary suspension as sustained or as modified by the [MEC] shall remain in effect pending a final decision thereon by the Governing Body[, either the JRC or SVC's appeal board]."

24

shall be entitled to determine the order of or procedure for presenting evidence and argument during the hearing and shall have the authority and discretion to make all rulings on questions, which pertain to matters of law, procedure or the admissibility of evidence." Since the JRC's charge was whether the MEC's actions in 2007 were reasonable and warranted, mitigating conduct by Dr. Sadeghi thereafter was irrelevant and could be appropriately excluded by Coppo.

Additionally, much of the evidence Dr. Sadeghi complains was improperly excluded was actually admitted. For instance, Coppo explicitly permitted Dr. Sadeghi to introduce evidence of his "participation in the UCSD PACE Program . . . ." The administrative record includes both the certificate of completion and assessment of Dr. Sadeghi's performance in the program, and Dr. Sadeghi's and his wife's testimony about his participation in the program in 2008. Dr. Sadeghi and his wife also testified about the psychiatric treatment he received after 2007, as well as the 2008 resolution of the accusation filed with the Medical Board.

In sum, we find no denial of fair procedure as a result of the JRC proceeding being confined to the MEC's 2007 actions or the exclusion of any evidence of mitigating conduct by Dr. Sadeghi after 2007.

### B.

Dr. Sadeghi argues the makeup of the JRC was defective in three respects: (1) the committee members were biased against him; (2) no member practiced in his specialty; and (3) the panel had less than the requisite three hospital staff members.

25

Dr. Sadeghi asserts bias based on the fact that Barton, Boyd and Dr. Song made the initial contact with each member of the JRC and Barton "outlin[ed] the case" to Dr. Ostrander. Under the hospital's bylaws, the MEC recommends a "Judicial Review Committee to the Board of Directors for appointment." The board then has the opportunity to object to the selection of members or they are deemed approved. While the record does not address how the initial members were selected, the MEC was entitled to "the unilateral selection of [the] panel members and a hearing officer" subject to Dr. Sadeghi's right to voir dire. (*Kaiser Foundation Hospitals v. Superior Court, supra*, 128 Cal.App.4th at p. 109; see also *El-Attar v. Hollywood Presbyterian Medical Center, supra*, 56 Cal.4th at p. 996 ["In the administrative law context, an adjudicator's impartiality in reviewing the propriety of an adverse action taken by an agency may be presumed even if the adjudicator is chosen by, and is a member of, the agency prosecuting the matter."].)

Further, the questioning during voir dire revealed nothing improper about the initial communications with the panel members, which were necessary to assemble the JRC. For instance, when asked "how did you first hear about this case," Dr. Ostrander responded the "[f]irst time I heard there was a JRC was from Mr. Barton. He called and asked if I would participate as a member. [¶] . . . [¶] He asked if I would be willing to sit on a panel and gave a very brief thumbnail sketch of the elements of the case." We do not find anything improper in the MEC's selection of the JRC members or its initial contacts with them.

26

Dr. Sadeghi next argues the panel was defective because it did not include "an interventional cardiologist with experience in lower extremity intervention." Section 809.2, subdivision (a) states "[t]he hearing shall be held, as determined by the peer review body, before a trier of fact, which shall be . . . before a panel of unbiased individuals who shall gain no direct financial benefit from the outcome, who have not acted as an accuser, investigator, factfinder, or initial decisionmaker in the same matter, and which shall include, *where feasible*, an individual practicing the same specialty as the licentiate." (Italics added.) The hospital's bylaws model this statute, providing that "[m]embership on a Judicial Review Committee shall, *where feasible*, include an individual practicing the same specialty as the member." (Italics added.)

When the JRC was initially empanelled, it included an interventional cardiologist, Dr. Ostrander, who Dr. Sadeghi describes as similar to himself, and an interventional radiologist, Dr. Saeed. When the JRC reconvened in September 2009, Dr. Sadeghi stipulated to the reduced panel without Dr. Ostrander and did not request he be replaced with another interventional cardiologist. Further, Dr. Sadeghi explained during the hearing that his practice involved a crossover of these two specialties. In fact, Dr. Sadeghi testified his own practice had an agreement with the hospital's radiology group that if there were complications with procedures involving the lower extremities, an interventional radiologist would be called to assist. In light of Dr. Sadeghi's testimony concerning the involvement of both specialties in lower extremity procedures, we reject his contention that the panel did not include a specialist in his practice area.

27

We also reject Dr. Sadeghi's argument that the panel was improperly constituted because it contained only two members of the hospital's medical staff. The hospital's bylaws state the JRC "shall be composed of not less than three members of the Medical Staff who are not in direct economic competition with the member[] who requested the hearing, who shall gain no direct financial benefit from the outcome, who have not acted as accuser, investigator, fact finder, initial decision maker or otherwise have not . . . actively participated in the consideration of the matter leading up to the recommendation or action." As with the physician's specialty, if "it is not feasible to appoint[] a [JRC] from the active Medical Staff, the Medical Executive Committee may appoint members from other staff categories or practitioners who are not members of the Medical Staff."

When Dr. Sadeghi challenged the makeup of the panel at the hearing, Barton argued it was not feasible for the panel to include three members of the hospital's medical staff because of the need to include an invasive cardiologist who was not in economic competition with Dr. Sadeghi. Barton stated the "medical staff does not encompass enough people where the claim couldn't be made that somebody from invasive cardiology here wouldn't be in direct competition with Dr. Sadeghi . . . ." Barton further argued the MEC wanted the JRC to also include an interventional radiologist and a psychiatrist, both of which also needed to come from outside the hospital. As with the invasive cardiologist, an outside interventional radiologist was necessary because of economic competition with Dr. Sadeghi. An outside psychiatrist was needed because those on the medical staff were involved in Dr. Sadeghi's case in some way. Dr. Sadeghi did not

28

dispute these assertions. In light of these facts, we conclude the hearing officer's decision to deny Dr. Sadeghi's request to include another member of the hospital staff was within the limitations imposed by section 809.2, subdivision (a) and the hospital's bylaws.

C.

On September 21, 2007, Coppo issued an order precluding Dr. Sadeghi from any "further ex parte communications, either orally, by e-mail, by fax, or by ordinary mail, with the Hearing Officer, Mr. Barton, Sharp Chula Vista Medical Staff, the Sharp Chula Vista Medical Executive Committee, employees, agents and ancillary personnel of Sharp Chula Vista Hospital, on any matter relating to the Notice of Charges which frames the issues to be tried in this Judicial Review proceeding." Dr. Sadeghi contends there was no basis for Coppo to issue this order and that it prevented him from preparing an adequate defense in violation of his right to fair process. We disagree.

Dr. Sadeghi correctly asserts a fair hearing "requires that the doctor be given a full and fair opportunity to examine and collect evidence and prepare his case for the hearing." (See *Rosenblit v. Superior Court, supra*, 231 Cal.App.3d at p. 1445 [in drafting its peer review procedure, the organization should "insure a fair opportunity for an applicant to present his position"], italics omitted.) As discussed, the physician's right to fair procedure arises from the statutory peer review scheme. (*Kaiser Foundation Hospitals v. Superior Court, supra*, 128 Cal.App.4th at p. 102.) While no particular statutory provision addresses the physician's right to communicate directly with potential witnesses, two provisions address the ability to present a defense. Section 809.2, subdivision (d) provides the licentiate "the right to inspect and copy . . . any documentary

29

information relevant to the charges which the peer review body has in its possession or under its control. . . ." This right, however, is limited. "The . . . presiding officer shall consider and rule upon any request for access to information, and may impose any safeguards the protection of the peer review process and justice requires." (§ 809.2, subd. (d).) Section 809.3, subdivision (a)(3) gives the parties the right to "call, examine, and cross examine witnesses." The discovery rights afforded by these statutes are "not as broad as a civil discovery standard." (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 627.)

The September 21, 2007 order was precipitated by complaints from hospital staff about communications by Dr. Sadeghi that were perceived as harassing, Dr. Sadeghi's intrusions into the hospital's medical records department, and Dr. Sadeghi's direct written communication with Coppo. In light of these events, we find Coppo's order appropriate and within his right to "impose any safeguards" to protect the peer review process. (§ 809.2, subd. (d).) The order applied to Dr. Sadeghi individually, not his counsel, and was not an obstacle to Rosenberg's or Muellenberg's ability to obtain evidence or call witnesses.[11] It did not, therefore, violate any procedural right created by the statutory peer review system or prejudice Dr. Sadeghi's ability to present his defense.

D.

As discussed, on February 28, 2008, Dr. Sadeghi wrote to Coppo to state he would no longer be represented by Rosenberg and to request the MEC likewise proceed without

---

[11] The record also shows that at the point Dr. Sadeghi decided to represent himself, Coppo reconsidered the contact limiting order.

representation. The following day, Coppo convened a conference call with Dr. Sadeghi and Barton to discuss this request. During the call, Dr. Sadeghi stipulated to Barton's continued representation of the MEC. Dr. Sadeghi represented himself at one session. Thereafter Rosenberg resumed his representation of Dr. Sadeghi.

Despite these facts, Dr. Sadeghi now contends the one hearing session (out of more than 35) in which he was not represented violated a fair process right created by section 809.3, subdivision (c) and the hospital's bylaws.[12] We do not agree. The record is clear Dr. Sadeghi agreed to the MEC proceeding with representation and this alone obviates his complaint. (See *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 826 [failure of physician to raise objection before the panel or at later hospital appellate review hearing constituted waiver].)

E.

Dr. Sadeghi argues the JRC was not commenced within 60 days as mandated by section 809.2, subdivision (h) and Article VIII, Section 3.C of the hospital's bylaws.[13] This argument was appropriately rejected by the superior court. Dr. Sadeghi first

---

[12] Section 809.3, subdivision (c) requires the peer review body to "adopt written provisions governing whether a licentiate shall have the option of being represented by an attorney at the licentiate's expense." It further provides "[n]o peer review body shall be represented by an attorney if the licentiate is not so represented . . . ." (§ 809.3, subd. (c).) Article VIII, Section 4.B of the hospital's bylaws provides the medical staff member is "entitled to representation by legal counsel in any phase of the hearing by an attorney at law" and that the "Medical Executive Committee shall not be represented by an attorney at law if the member is not so represented."

[13] Although Dr. Sadeghi refers to 60 days as the relevant time limit, the hospital's bylaws require the hearing to be commenced within 45 days if a summary suspension is involved.

exercised his right to a formal hearing on May 31, 2007. The hearing commenced 40 days later with voir dire of the JRC members on July 9, 2007, within the required timeframe. Dr. Sadeghi argues Code of Civil Procedure, section 581, subdivision (a)(6), which defines commencement of a trial as the beginning of opening statements or the examination of the first witness, applies. According to Dr. Sadeghi, therefore, the hearing did not commence until the first witness was called on September 25, 2007. Dr. Sadeghi provides no support for this contention. We decline to impose a definition set forth in the Code of Civil Procedure on the medical peer review system.

Dr. Sadeghi also contends the hearing was not completed within a reasonable time and Coppo granted continuances without good cause as required by section 809.2, subdivision (h). Dr. Sadeghi asserts that throughout the three-year ordeal he was pressing to move the hearing forward while the MEC and its counsel frustrated those efforts. While there is no question the hearing took an inordinate amount of time, the record does not corroborate Dr. Sadeghi's account of the delay.

Most notably, a 15-month break in the proceedings, from June 2008 to September 2009, resulted from Dr. Sadeghi's own course of action. Specifically, after 15 hearing sessions, Dr. Sadeghi retained new counsel and changed strategy. After cancellation of the hearing session scheduled for June 23, 2008, despite Coppo's repeated requests for additional hearing dates, Muellenberg failed to provide dates for the summer of 2008. Instead, on August 4, 2008, Dr. Sadeghi sent a letter to the MEC requesting reinstatement. Thereafter, Dr. Sadeghi agreed to adjourn proceedings while the MEC considered his request. After the MEC declined to reinstate Dr. Sadeghi,

32

communications among counsel, the hearing officer and the panel members concerning the reconstitution of the JRC occurred through the summer of 2009. By the parties' agreement, the judicial review hearing finally resumed on September 23, 2009.

Also contrary to Dr. Sadeghi's assertions, the record relating to the scheduling of hearings before and after the interim adjournment shows cooperation among all parties to move the proceedings forward as quickly as possible. The one 30-day continuance granted in August 2007 was based on a showing of good cause and was granted only after briefing and oral argument. Hearing dates were otherwise set based on the parties' agreement. The pace of the proceedings was understandably constrained by the schedules of the five panel members, all busy practicing physicians, the hearing officer, counsel for both sides, and 21 percipient and expert witnesses. Despite these constraints, Coppo worked diligently to advance the case.

In light of these facts, we find no denial of Dr. Sadeghi's right to have the charges adjudicated within a reasonable amount of time.

### III.

Finally, Dr. Sadeghi contends insufficient evidence supported the JRC's finding that the suspension of his privileges "as of the time of the JRC decision" was reasonable and warranted. He argues had he been able to present evidence concerning his technical ability, mental wellbeing and fulfillment of the requirements imposed by the MEC after his privileges were suspended, the MEC could not have sustained its burden of proof. We reject this hypothetical. As discussed, the JRC was charged with determining whether the MEC's decisions in 2007 were reasonable and warranted at the time they

33

were made.  Dr. Sadeghi does not contend insufficient evidence supported those findings. Further, after our independent review of the record, we conclude the JRC's findings were supported by substantial evidence.

## DISPOSITION

The order is affirmed.  Each party to bear its own costs.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.

34

Filed 11/19/13

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

H. MEHRDAD SADEGHI,
Plaintiff and Appellant,
v.
SHARP MEMORIAL MEDICAL CENTER CHULA VISTA,
Defendant and Respondent.
**D060429**
**San Diego County No. 37-2010-00080039-CU-WM-SC**

THE COURT:

      The opinion filed October 23, 2013, is ordered certified for publication.

                           HUFFMAN,
                           Acting Presiding Justice