Filed 12/17/13  Samuel v. Providence Healthcare Systems-So. Cal. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHRISTOJOHN SAMUEL et al., | B242208 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. PC051773) |
| v. | |
| PROVIDENCE HEALTHCARE SYSTEMS-SOUTHERN CALIFORNIA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Melvin Sandvig, Judge.  Affirmed.

Carroll, Kelly, Trotter, Franzen & McKenna, Richard D. Carroll, David P. Pruett and Jennifer A. Cooney for Defendant and Appellant.

Nossaman LLP, Mitchell J. Green and Chelsea N. Trotter for Plaintiffs and Respondents.

_____

Defendant and appellant Providence Health Systems-Southern California (the Hospital), doing business as Providence Holy Cross Medical Center, appeals from an order denying a special motion to strike under the anti-SLAPP statute,[1] Code of Civil Procedure section 425.16,[2] in favor of plaintiffs and respondents Christojohn Samuel, M.D., Christojohn Samuel, M.D., Inc., Walid Arnaout, M.D., and Walid Arnaout, M.D., Inc. (referred to collectively as the Doctors). The Doctors allege the Hospital negligently failed to control the disruptive behavior of another physician. The trial court denied the anti-SLAPP motion, finding the complaint was subject to the anti-SLAPP statute because it arose from a peer review proceeding, but the Doctors had demonstrated a probability of prevailing on the merits. On appeal, the Hospital contends the Doctors failed to show a probability of prevailing for several reasons. However, we conclude the complaint does not arise in connection with a peer review proceeding, and therefore, the anti-SLAPP statute does not apply. Therefore, we affirm the order denying the anti-SLAPP motion.[3]

## FACTS AND PROCEDURAL BACKGROUND

### Allegations of the Complaint

On October 20, 2011, the Doctors filed a complaint against the Hospital and Bradley Roth, M.D. Arnaout alleged a cause of action for battery against Roth, and the Doctors alleged a cause of action for negligence against the Hospital. Samuel, Arnaout, and Roth are trauma surgeons and members of the Hospital's medical staff. Samuel was the medical director of trauma services until mid-2009.

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[2] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

[3] The Hospital's motion to dismiss the Doctors' cross-appeal is granted.

2

In August 2008, Roth campaigned for on-call shifts at the Hospital to be scheduled for himself and his practice partner David Hanpeter, M.D., on a preferential basis, rather than divided fairly among the eligible trauma surgeons. Roth intended to displace and interfere with the economic benefits of Samuel and the other trauma surgeons. To accomplish his purpose, Roth used insulting and inappropriate language, disparaged the Doctors' professional competency to their patients, interfered with other physicians' care and treatment by inspecting their patients' charts, replacing their orders with his own, and providing contrary instructions to nurses, wrote letters to and requested meetings with the Hospital's administration in order to question Samuel's leadership and influence the Hospital to substitute Hanpeter as medical director, refused to treat patients affiliated with the Doctors, and made false and exaggerated reports to peer review committees against the Doctors and other trauma surgeons. In December 2008, a department chairperson complained to the Hospital administration about Roth's conduct and stated that Roth's conduct threatened the quality of patient care.

On December 18, 2009, Roth physically attacked Arnaout. The Hospital took no disciplinary action. On several occasions, Roth and Hanpeter acknowledged that Roth's conduct was disruptive and needed improvement. The Doctors and other physicians repeatedly complained to the Hospital about Roth's conduct, yet the Hospital did not take reasonable measures to investigate or control Roth's conduct.

The Hospital expressly acknowledged that the physicians' ability to deliver quality care depends on communication, collaboration, and teamwork. The Hospital undertook to adopt, implement, and enforce conduct standards to manage disruptive and inappropriate behavior by individual physician members of the medical staff and to assure a workplace free from intimidation, disruption, and violence. The Doctors relied on the Hospital's representations that they would enforce these standards, which were contained, in part, in the medical staff bylaws. The Hospital had a duty to use reasonable care to enforce these standards. Roth's disruptive conduct violated section 3.8 of the medical staff bylaws. The Hospital breached its duty of care by failing to enforce the standards against Roth. As a consequence of the Hospital's breach, the Doctors were

3

forced to either resign or endure intolerable working conditions that jeopardized their ability to deliver quality patient care. Because no reasonable, similarly situated physician would have continued to provide care under these conditions, the Doctors resigned from the trauma service. As a proximate cause, the Doctors have suffered damages, including loss of income, and suffered emotional distress. The Hospital's failure to enforce its policies against Roth amounted to knowing ratification of his conduct.

**The Hospital's Special Motion to Strike and Supporting Evidence**

The Hospital filed an anti-SLAPP motion. The Hospital argued that the anti-SLAPP statute applies in this case, because the complaint raises issues related to the Hospital's peer review process, which is considered official proceedings under the anti-SLAPP statute. The Doctors' cause of action for negligence was based on a provision of the medical staff bylaws setting a peer review standard and procedure. The Hospital's peer review process encompasses assessment of a physician's disruptive conduct and the Hospital has no control over physicians other than through peer review. The allegations of the complaint refer to reports made by Roth in connection with peer review. The Doctors, in fact, initiated a request for corrective action under the peer review procedures. Issues regarding the Doctors' status on the medical staff or disruptive behavior by Roth were subject to resolution under the bylaws. The complaint in the instant case is an improper collateral attack. The Hospital also argued that it was entitled to prosecutorial immunity when exercising discretion in acting on complaints of misconduct.

Lastly, the Hospital argued the Doctors could not establish a probability of prevailing, because: peer review acts are immune from liability, the Hospital has no control over physicians other than through peer review, the Doctors failed to exhaust administrative remedies, the Hospital is not liable for Roth's battery of another physician, and there were no allegations on behalf of the medical corporations.

In support of the anti-SLAPP motion, the Hospital submitted the declaration of its chief executive officer, as well as the medical staff bylaws. Article III of the bylaws

4

explains the nature and qualifications for membership on the medical staff, including the code of conduct for practitioners set forth in section 3.8.  The conduct provisions state, as a member of the medical staff, "I acknowledge that the ability of practitioners . . . and hospital staff employees to jointly deliver high quality health care greatly depends upon their ability to communicate well, collaborate effectively, and work as a team.  I recognize that patients, family members, visitors, colleagues and hospital staff members must be treated in a dignified and respectful manner at all times.  To this end, practitioners on the medical staff of [the Hospital] . . . are expected to conduct themselves in a professional manner whenever they are on the grounds of the medical center.  I agree to adhere to the following guidelines in support of enhancing the delivery of quality patient care within [the Hospital].  [¶]  1.  Respectful Treatment  [¶]  I agree to treat patients, family members, visitors and members of the health care team of [the Hospital] in a respectful and dignified manner at all times.  I acknowledge that my language, attitude and appearance may impact delivery of quality patient care.  I agree to work with other members of the health care team to resolve conflicts or address occasional lapses of decorum when they arise. . . .  [¶] . . . [¶]  3.  Behavior  [¶]  I agree to refrain from any behavior that is deemed to be intimidating or harassing . . . .  As a member of the Medical Staff . . . , by accepting appointment and reappointment to the Medical Staff, I agree to abide by these provisions.  Every effort will be made to be non-judgmental with interviews and provide opportunity to correct the problem prior to corrective action by the Medical Staff.  Process is defined in the 'Policy on Joint Investigation of Alleged Medical Staff Discrimination, Harassment, or Disruptive Behavior – Investigation and Disciplinary Procedures.'  (Added 12/08)"

Article VIII of the bylaws provides procedures for corrective action.  The criteria to initiate routine corrective action under section 8.1-1 is set forth as follows:  "An investigation or corrective action may be requested, and ultimately initiated, against any practitioner with clinical privileges and/or Medical Staff membership who engages in, makes, or exhibits acts, statements, demeanor or professional conduct (either within or outside of the Hospital) and the same:  [¶]  (a)  is, or is reasonably likely, to be

detrimental to patient safety or to the delivery of quality patient care within the Hospital; to be disruptive to Hospital operations; to constitute fraud or abuse; or, to be, in other respects, lower than the standards of the Hospital and the Medical Staff; or, [¶]  (b) results in the imposition of sanctions by any governmental authority."

A proposal for corrective action or a request for investigation may be initiated under section 8.1-2 by the medical executive committee (MEC), or by a written request to the MEC from a medical staff officer, the chairman of any clinical department in which the practitioner holds membership or clinical privileges, the chairman of any standing medical staff committee, the governing body, or the administrator.  A written request proposing corrective action or investigation must identify the underlying conduct.  When the MEC receives a proposal for action under section 8.1, the chief of staff notifies the administrator and the governing body, keeping them informed of subsequent action.

Upon receipt of a proposal for action under section 8.1, the MEC may take action or direct that an investigation be undertaken.  The MEC must take action within 60 days of receiving a proposal for action under section 8.1.  The MEC's options include recommending no corrective action, rejection, or modification of the proposed corrective action, a letter of admonishment, imposition of probation terms, reduction or revocation clinical privileges, and other increasingly severe actions.  If the MEC recommends corrective action, the recommendation is transmitted to the Board of Trustees (the Board).  If the MEC's recommendation is supported by substantial evidence, the recommendation must be adopted by the Board as a final action, unless the member requests a hearing, as provided for in the bylaws.  The MEC may defer any action when additional time is needed to investigate or consider the proposal for action.  Following a deferral, the MEC must take action by the deadline specified in the deferral, or if no deadline was specified, then within 45 days of the deferral.  Any recommendation by the MEC which constitutes grounds for a hearing entitles the affected practitioner to procedural rights set forth in the bylaws.

Section 8.1-8 specifies procedures to follow based on the substance of the MEC recommendation.  Under section 8.1-8, subdivision (e), if the MEC fails to act in a

reasonable period of time on a proposal for corrective action, the governing body may set a reasonable deadline for the MEC to take action, and if the MEC does not adhere to the deadline, take action on its own initiative and recommend action that does not constitute grounds for a hearing. If the MEC fails to investigate or take disciplinary action contrary to the weight of the evidence, the Board may direct the MEC to initiate investigation or disciplinary action after consultation with the MEC. The Board can initiate corrective action if the MEC fails to take action in response to the Board's direction.

The Hospital also submitted its written policy on joint investigation of alleged medical staff/professional staff discrimination, harassment, or disruptive behavior—investigation and disciplinary procedures. The policy states that complaints of discrimination, harassment, or disruptive behavior concerning a practitioner are referred to the chief medical officer and the chief of staff of the medical staff/professional staff. The policy states that upon closure of a review or investigation, the reporting party shall be given appropriate notice. Disruptive behavior was defined as "conduct that substantially interferes with an individual's employment or creates an intimidating, hostile or offensive work environment." The policy primarily focuses on discrimination and harassment but states that if the initial review shows the practitioner or member of the medical/professional staff demonstrated a pattern of disruptive behavior, then a formal investigation process will be launched, as described in the policy.

The Hospital submitted a letter from Chief Executive Larry Bowe, dated August 17, 2009, stating that Hanpeter was taking over as medical director of trauma. The Hospital also submitted a letter, dated September 4, 2009, from Samuel, Arnaout, and two other physicians to the president of the MEC objecting to the changes in the trauma service. They asked to have the trauma service placed on the MEC's agenda for evaluation, rather than allowing the Hospital administration to make a decision on behalf of the MEC.

On October 26, 2009, Samuel, Arnaout, and two other physicians submitted a request for corrective action investigation to the MEC, Bowe, and other hospital officials. They requested initiation of a corrective action investigation of Roth pursuant to

7

section 8.1-1 and 8.1-2 of the bylaws. The basis for the request was that Roth repeatedly engaged in actions detrimental to patient safety and quality of care, and consistently acted in a manner disruptive of hospital operations. They accused Roth of exhibiting arrogance and disrespect to colleagues. Previous complaints were swept under the rug after a token apology from Roth. Roth improperly reviewed patient records and altered patient care without the knowledge or approval of the attending physician. The changes were life threatening and made without examining the patient. Roth criticized the attending physician in the presence of nurses and the patient's family. Roth exercised clinical procedures for which he had not been trained. He refused to assist a patient in respiratory distress. He performs unnecessary procedures. These complaints are documented in peer review records and warrant an investigation.

On April 30, 2010, Arnaout resigned from the trauma service. Samuel resigned on May 3, 2010.

The Hospital also filed a demurrer to the complaint.


**The Doctors' Opposition to the Special Motion to Strike and Supporting Evidence**


The Doctors opposed the anti-SLAPP motion on the ground that the anti-SLAPP statute did not apply, because no official proceeding had taken place and their negligence claim was based on conduct, not communication. Even if the anti-SLAPP statute applied, they asserted they could show a probability of prevailing, because the Hospital voluntarily assumed a duty to control disruptive conduct by medical staff members, which the Hospital breached by failing to act in light of Roth's conduct.

The Doctors provided a letter from the Hospital to the medical staff distributing a standard on disruptive physicians that had been approved by the Hospital's executive council. The Hospital stated, "Disruptive behavior and other inappropriate behavior undermine our culture of safety and the performance of the health care team entrusted with the care of our patients."

8

They also provided copies of letters in which physicians had complained to the Hospital about Roth's disruptive behavior. The chairman of the division of orthopedic surgery at the Hospital wrote a letter, dated December 5, 2008, with complaints against Roth. He accused Roth of ripping orders from a patient's chart and substituting his own orders. He disputed several accusations made by Roth and criticized Roth's ability to perform certain procedures. He stated that patient care was being compromised on a daily basis as a result of Roth's demeaning and disruptive behavior. On December 15, 2008, Samuel also wrote a letter to the Hospital's director of human resources seeking assistance with Roth's disruptive behavior.

The Doctors submitted Arnaout's declaration and copies of letters that he had written. At a meeting in November 2008, Arnaout witnessed Roth stamp his foot, raise his voice, and berate Samuel. Arnaout wrote a letter, dated May 20, 2009, to the chairman of the department of surgery, complaining that Roth was criticizing Arnaout's care in meetings and reviews without an objective basis. Arnaout asked the administration and medical staff office for a full investigation of Roth's motives. Arnaout received no response.

In July 2009, Arnaout complained that Roth had interfered with the care of Arnaout's patient by ordering a test that Arnaout did not think was necessary. Arnaout received no response from the Hospital other than Samuel's response that the Hospital would not support curbing Roth's behavior.

On August 31, 2009, Arnaout was in surgery at another hospital when his patient at the Hospital suffered respiratory distress. He learned from a third party that Roth refused to administer care unless the patient was blue or needed a surgical airway. Arnaout wrote a complaint to Samuel as the director of trauma services dated September 25, 2009, asking for a discussion of the incident and Arnaout's concerns at the next peer review committee. Arnaout was told that the matter would be handled outside of the peer review process, but it was not.

On October 26, 2009, Arnaout, Samuel, and two other members of the trauma department submitted the request for corrective action described above. The chief of

9

staff wrote a letter to Samuel, dated November 2, 2009, in response. The request for an investigation had been considered by the MEC at its meeting that day. "The MEC noted that your letter raised serious concerns regarding the physician's quality of care. A number of cases referenced in your letter have not been reviewed by any peer review committee at [the Hospital] to date. As a result, the MEC voted to table your request for an investigation pending the completion of a review of these cases by the Surgery Peer Review Committee. After the MEC has received the results from the Surgery Peer Review Committee's review, the MEC will act upon your request."

At a meeting in November 2009, Hanpeter admitted Roth had behavioral issues but insisted Roth had made contributions to the department and would be a team player. Roth acknowledged his behavior had been inappropriate, apologized, and promised to change his behavior. At the end of the meeting, everyone received a copy of a book about improving the Hospital culture.

On December 19, 2009, a patient arrived at 6:50 p.m. and Arnaout's shift was scheduled to end at 7:00 p.m. Roth arrived for his shift at 7:00 p.m. Arnaout was busy with another patient and asked Roth to care for the new patient. Roth exploded, "Dr. Arnaout, you have written me up five times in the past few months, five times[, Doc]. It's five minutes to [7:00] and its five minutes on your time. He's all your[s] buddy." After taking care of both patients, Arnaout crossed paths with Roth at 7:30 p.m. Roth complained that Arnaout had written him up five times. Arnaout refused to discuss it and walked away. Roth grabbed Arnaout by the shoulder and stopped him. Arnaout accused him of assault, and Roth apologized. Arnaout filed a complaint about the incident on December 26, 2009, but did not receive a substantive response. The Hospital investigated Arnaout's conduct in connection with the incident and reprimanded him for using profanity.

On March 1, 2010, the Hospital's chief of staff sent a letter to Arnaout stating, "As you are aware, the Surgery Peer Review Committee was tasked by the [MEC] to review cases referenced in your letters, dated October 26, 2009, and December 1, 2009, regarding an investigation of Bradley Roth, M.D. The Surgery Peer Review Committee

10

completed its thorough review and submitted its findings to the MEC. The MEC has determined that no formal investigation, pursuant to the Medical Staff Bylaws, is warranted at this time regarding the issues you raised concerning Dr. Roth's patient care."

"With regard to the issues you raised concerning Dr. Roth's alleged disruptive behavior, the MEC has not yet made a determination whether a formal investigation is necessary. As a related matter, as you know, [the Hospital] recently appointed a new Trauma Director. The MEC hopes this new Trauma Director will work to alleviate the inter-personal conflicts you believe exist between members of the Trauma Team, including Dr. Roth."

Arnaout was forced to resign from the medical staff on April 30, 2010, because the Hospital failed to take any reasonable action in response to his complaints about Roth's disruptive behavior. Roth's continuing disruptive conduct rendered the Hospital an unreasonably difficult workplace, at which patient care was at risk. Arnaout suffered financial loss as a result of his resignation, including stipends for being on trauma call and referral patients. He never received notice that any adverse action was contemplated against his medical staff privileges for which he would have been entitled to a hearing.

The Doctors submitted the declaration of Danielle Dabbs, M.D., that Roth was hostile and aggressive in meetings. He was hypercritical and behaved inappropriately. He interfered with her care of patients by reviewing their charts without authorization and making suggestions for their care. He had authorized nurses to discuss patient management issues with him, rather than the primary attending physician. She complained to the nurse manager and the intensive care unit director about Roth's behavior, but no action was taken.

On May 25, 2009, Dabbs wrote a letter to the Hospital requesting clarification of Roth's position as "Trauma ICU Director." She complained about Roth's unprofessional behavior in meetings. She also complained about an incident in which Roth called to make a recommendation about a patient that Dabbs had admitted. Roth had not seen the patient but made a care recommendation based on a report from a nurse. He also

11

reviewed her patients' charts and accused her of failing to document them properly. Dabbs believed Roth was overstepping his role. She had offered to provide a lecture for nurses, but Roth insisted on being the only lecturer. She requested a meeting to discuss the issues.

The Doctors submitted a declaration of a nurse who had received unwelcome personal advances. The nurse complained to the Hospital, but Roth's advances continued. In May 2011, the nurse was forced to take leave due to Roth's harassment.

Samuel submitted his declaration. He was terminated from the position of medical director of the trauma department in August 2009. His medical staff privileges were not affected. The Hospital operated pursuant to policies, procedures, and standards prohibiting disruptive conduct. Roth's continuing disruptive conduct forced Samuel to resign from the Hospital on April 30, 2011. He resigned because Roth's conduct rendered the Hospital an unreasonably difficult place to work, at which he felt patient care was always at risk from Roth's disruptive conduct. He suffered financial loss as a result of the resignation.

The Doctors also opposed the Hospital's demurrer.

**Trial Court Proceedings**

The Hospital filed replies to the oppositions to the anti-SLAPP motion and the demurrer. A hearing was held on May 21, 2012. The trial court denied the anti-SLAPP motion. The court found the negligence cause of action arose out of the Hospital's peer review proceedings. Therefore, the Hospital met its initial burden of showing the complaint arose out of a protected activity. However, the Doctors had shown a probability of prevailing. The negligence claim was based on the Hospital's failure to act, not a communication or communicative conduct. The Hospital's prosecutorial immunity argument was based on analogy, and the Hospital failed to show it was immune as a matter of law. The Doctors alleged the Hospital affirmatively undertook a duty to prevent this type of disruptive conduct. The Hospital failed to show there were

12

administrative procedures which the Doctors could have complied with after the Hospital decided not to discipline Roth, so there was no failure to exhaust administrative remedies. The court also overruled the demurrer. The Hospital filed a timely notice of appeal from the order denying the anti-SLAPP motion.

## DISCUSSION

### Analytical Framework

The anti-SLAPP statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Courts are to construe this statute "broadly" in favor of the moving party. (*Id*., subd. (a).)

The trial court conducts a two-step analysis of an anti-SLAPP motion. (*Johnson v. Ralphs Grocery Co.* (2012) 204 Cal.App.4th 1097, 1103.) "'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)" (*Johnson, supra,* at p. 1103.)

To establish the first step, the defendant must show the allegedly wrongful conduct was "in furtherance of " the defendant's free speech or petition rights and the cause of action arose from the protected conduct. (§ 425.16, subd. (b)(1).) The anti-SLAPP statute identifies four categories of actions that are "in furtherance of" a defendant's free speech or petition rights. (*Id.*, subd. (e); see *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) As pertinent to this case, "act in furtherance of a person's

13

right of petition or free speech" includes: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, . . . or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

If the court finds the cause of action arose from protected activity, the burden shifts to the plaintiff to show a probability of prevailing on the claim. "[T]o establish a probability of prevailing on the claim [citation] . . . the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation]; though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) "'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

"We review an order granting an anti-SLAPP motion de novo, applying the same two-step procedure as the trial court. [Citation.] We look at the pleadings and declarations, accepting as true the evidence that favors the plaintiff and evaluating the defendant's evidence '"only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' [Citation.] The plaintiff's cause of action needs to have only '"minimal merit" [citation]' to survive an anti-SLAPP motion. [Citation.]" (*Cole v.*

14

*Patricia A. Meyer & Associates, APC* (2012) 206 Cal.App.4th 1095, 1105.) "If the trial court's decision is correct on any theory applicable to the case, we affirm the order regardless of the correctness of the grounds on which the lower court reached its conclusion." (*Robles v. Chalilpoyil* (2010) 181 Cal.App.4th 566, 573.)


## Gravaman of the Complaint


The Hospital contends the anti-SLAPP statute applies to the instant complaint, because peer review proceedings are subject to the anti-SLAPP statute, the complaint essentially alleges the Hospital failed to discipline a disruptive doctor through the peer review process, and some allegations of the complaint refer to statements made in peer review proceedings. We conclude the gravamen of the complaint was that the Hospital failed to take action to control the behavior of a disruptive doctor, which concerns non-communicative conduct. Therefore, the anti-SLAPP statute does not apply.

To determine whether a claim arises from protected activity, a court must "disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies' and whether the trial court correctly ruled on the anti-SLAPP motion. [Citation.] We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.' [Citation.]" (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1271-1272.) "The anti-SLAPP statute's definitional focus is [on] the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92.)

"If the core injury-producing conduct by the defendant that allegedly gave rise to the plaintiff's claim is properly described with only collateral or incidental allusions to protected activity, then the claim does not arise out of protected speech or petitioning activity. [Citation.]" (*Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 55 (*Young*).) "The question should be whether the plaintiff is seeking relief from the

15

defendant for its protected communicative acts. [Citation.] . . . "'[Y]ou have a right *not* to be dragged through the courts because you exercised your constitutional rights.'" [Citation.]" (*Ibid.*)

We recognize that a peer review proceeding is an "official proceeding" for purposes of the anti-SLAPP statute. (*Young*, *supra*, 210 Cal.App.4th at pp. 57-58.) However, the cause of action for negligence in this case does not "arise out of" a peer review proceeding or protected activity. (*Ibid.*)

"Hospitals in this state have a dual structure, consisting of an administrative governing body, which oversees the operations of the hospital, and a medical staff, which provides medical services and is generally responsible for ensuring that its members provide adequate medical care to patients at the hospital. In order to practice at a hospital, a physician must be granted staff privileges. Because a hospital's decision to deny a physician staff privileges may have a significant effect on a physician's ability to practice medicine, a physician is entitled to certain procedural protections before such adverse action may be taken. [Citation.]" (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 983 (*El-Attar*).)

"[The peer review] statute does not contemplate a strict separation between the medical staff and the governing body as a prerequisite for a fair peer review system. . . . In the context of physician discipline, where a peer review body, contrary to the weight of the evidence, fails to investigate or initiate disciplinary action, the governing body may direct the peer review body to do so after consultation with the peer review body ([Bus. & Prof. Code,] § 809.05, subd. (b)), and if the peer review body still fails to do so, then the governing body itself may take action ([Bus. & Prof. Code,] § 809.05, subd. (c))." (*El-Attar*, *supra*, 56 Cal.4th at pp. 992-993.)

"In other words, the statute provides that although the governing body must give deference to the determinations of the medical staff, it may take unilateral action if warranted. This allowance for independent governing board action furthers the 'primary purpose of the peer review process,' which 'is to protect the health and welfare of the people of California.' [Citation.] If, for whatever reason, the medical staff of a hospital

16

fails to take action against a physician who "'provide[s] substandard care or who engage[s] in professional misconduct,'" the governing board of the hospital serves as a fail-safe to ensure that such a practitioner is removed from the hospital's staff. [Citation.] The Legislature's statutory recognition of the governing board's role reflects the fact that the hospital itself is ultimately responsible for the health and safety of the patients it serves. [Citations.] 'A hospital has a duty to ensure the competence of the medical staff by appropriately overseeing the peer review process.' [Citations.]" (*El-Attar*, *supra*, 56 Cal.4th at p. 993.) "A hospital itself may be responsible for negligently failing to ensure the competency of its medical staff and the adequacy of medical care rendered to patients at its facility. [Citation.]" (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1143.)

In this case, the gravamen of the complaint is that the Hospital knew about Roth's disruptive behavior and failed to take reasonable measures to control it. Roth's behavior was so disruptive that patient care was jeopardized. He changed orders for patients who were not his own, violated confidentiality standards by reviewing the charts of other physicians' patients, and spitefully refused to treat certain patients. The Hospital took certain actions in response to the complaints about Roth's behavior. The Hospital replaced the trauma director to alleviate personality conflicts in the department, held a meeting to discuss conduct standards and passed out a book. The Hospital reviewed the Doctors' concerns but concluded certain allegations were unsupported and others were not ripe for assessment. The Doctors did not believe the Hospital's actions were sufficient under the circumstances, and the Doctors could not continue to work under the conditions. The actions the Hospital took or failed to take to control Roth's behavior constituted non-communicative conduct. The complaint does not arise from the Hospital's exercise of its right of petition or free speech. It is not based on a written or oral statement made in connection with an issue under consideration or review in a peer review proceeding. The references in the complaint to Roth's statements in peer review proceedings were incidental to the cause of action, which arose out of the Hospital's failure to act to ensure the competency of the medical staff.

17

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed. Respondents Christojohn Samuel, M.D., Christojohn Samuel, M.D., Inc., Walid Arnaout, M.D., and Walid Arnaout, M.D., Inc., are awarded their costs on appeal.


KRIEGLER, J.


We concur:


MOSK, Acting P. J.


KUMAR, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.